SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE OF ALABAMA, on Behalf of its members and on Behalf of a state-wide class of black voters, et al., Plaintiffs,

v.

Attorney General James H. EVANS, et al., Defendants,

United States of America, Amicus Curiae.

Civ. A. No. 88–H–462–N.

United States District Court, M.D. Alabama, N.D.

March 18, 1992.

**1470**

J. Richard Cohen and Elizabeth Johnson, Montgomery, Ala., for plaintiffs.

Simon, Wood & Crane, James C. Wood, Mobile, Ala., for defendant L.W. Noonan.

Balch & Bingham, David R. Boyd, Montgomery, Ala., Maynard, Cooper, Frierson & Gale, Fournier J. Gale, III, Birmingham, Ala., Atty. Gen. of Alabama's Office, Walter S. Turner, Chief Asst. Atty. Gen. and Asst. Attys. Gen. Ronald C. Forehand, Mark Givhan and Susan E. Russ, Montgomery, Ala., for all other defendants.

Blackwell & Keith, Cartledge W. Blackwell, Jr., Selma, Ala., additional counsel, for defendant John W. Jones, Jr.

John R. Dunne, Asst. Atty. Gen., Civ. Rights Div., Steven H. Rosenbaum, Sheila Delaney and Rebecca J. Wertz, Voting Section, CRD, U.S. Dept. of Justice, Washington D.C., U.S. Atty. M.D.Ala., Montgomery, Ala., for United States, amicus curiae.

## MEMORANDUM OPINION

HOBBS, District Judge.

This action was filed in May 1988 by black voters within various judicial circuits and districts in Alabama. Defendants are the Alabama Attorney General, the Chief Justice of the Alabama Supreme Court, the Alabama Secretary of State, and various probate judges. Plaintiffs claim that the system for electing judges in Alabama leaves black voters without an equal opportunity "to participate in the political process and to elect representatives of their choice" in violation of the Voting Rights Act as amended, 42 U.S.C. § 1973. Plaintiffs also claim that the system is in violation of the Fourteenth and Fifteenth Amendments of the United States Constitution.

Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 1973j(f) and 1983.

On June 7, 1989, the court rejected defendants' contention that Section 2 of the Voting Rights Act does not apply to judicial elections, *SCLC v. Siegelman*, 714 F.Supp. 511 (M.D.Ala.1989). After the Court of Appeals' decision in *League of United Latin American Citizens v. Clements*, 914 F.2d 620 (5th Cir.1990) (en banc), this Court stayed these proceedings (with the exception of discovery) to allow defendants to take an interlocutory appeal. When the Supreme Court of the United States held that judicial elections are covered by Section 2 of the Voting Rights Act, *Chisom v. Roemer*, —— U.S. ——, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); *Houston Lawyers' Ass'n v. Attorney Gen. of Texas*, —— U.S. ——, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), defendants withdrew their appeal, and this case, which had been assigned to Judge Dubina, was reassigned to this Judge when Judge Dubina went to the Court of Appeals. The case was tried in December 1991.

For the reasons hereinafter stated, this Court concludes that the system of electing trial judges in Alabama does not deny black voters an equal opportunity to participate in the political process and to elect judges of their choice, nor does such system violate the Fourteenth or Fifteenth Amendment of the Constitution.

Alabama has a unified judicial system of trial and appellate courts. The trial court of general jurisdiction is the circuit court with the district court being a trial court of limited jurisdiction. Circuit courts are divided into forty judicial circuits designated by number. Each circuit has one or more counties. At least one of the challenged circuits has as many as twenty-four circuit judges and some circuits have as few as two. Each county has at least one district judge. The number of circuit and district judges is set by the Legislature with the advice of the Alabama Supreme Court.

Judges are elected at large from their respective circuits or districts. Candidates for judicial office in circuits or districts with more than one judge must designate the numbered post for which they are a candidate.

Plaintiffs contend that the at-large, numbered position election system for trial judges dilutes black voting strength in violation of Section 2 of the Voting Rights Act in ten circuits and in four multidistrict judge districts. Plaintiffs also claim that the numbered place feature of the elections has been maintained for racially inspired reasons and has a discriminatory effect, thus violating the Fourteenth and Fifteenth Amendments of the Constitution of the United States.

Section 2 of the Voting Rights Act, as amended, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered. PROVIDED, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

## BACKGROUND OF PRESENT CHALLENGE

In *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court looked at a challenged redistricting plan for the election of state legislators in North Carolina. It held that in order to prove a violation of amended Section 2 of the Voting Rights Act on the basis of at-large elections, a minority group would be required to show: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single member district; (2) that the minority possesses political cohesion; (3) that the majority group votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

If plaintiffs are successful in proving the three prerequisites, the Supreme Court has directed that the court evaluate the "totality of circumstances," based upon a practical evaluation of the past and present realities to determine whether the political process is equally open to minority voters. *Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781.

As already noted, courts and judges were divided as to whether amended Section 2 of the Voting Rights Act applied to judicial elections. In two cases decided on the same day, June 20, 1991, *Chisom v. Roemer*, — U.S. —, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991); *Houston Lawyers' Ass'n v. Attorney Gen. of Texas*, — U.S. —, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), the Supreme Court rejected the contention that judicial elections were exempt from the commands of Section 2. In both cases, however, the Court pointed out the importance of considering in the "totality of circumstances" the interest of the state in its determination of its election system for judges. In *Chisom*, the Supreme Court stated that it did "not address any question concerning the elements that must be proved to establish a violation of the Act or the remedy that might be appropriate to redress a violation if proved." With clear prophecy, the Supreme Court in *Chisom* said: "Even if serious problems lie ahead in applying the 'totality of circumstances' described in § 2(b), that task, difficult as it may prove to be" must be attempted to carry out the mandate of the broadly worded statute. *Id.* 111 S.Ct. at 2368. At this time, therefore, the Supreme Court has not attempted to guide trial courts in how to

evaluate the circumstances, or what remedy is appropriate in judicial elections.

The task of determining whether the prerequisites for a violation of the Voting Rights Act are present where the challenged elections are for legislative positions or city or county governing bodies is far easier than where the challenge is to the election of judges, and the task of fashioning an appropriate remedy is also different and far more difficult. For example, it can be presumed that in a legislative election there are large numbers of potential candidates from minority citizens as well as majority. Since only lawyers are eligible to serve as judges, the number of eligible lawyers is a factor that must be considered. Moreover, trial judges essentially make their decisions alone. Where judges are elected from districts which have been crafted to contain a high percentage of blacks to assure the election of black candidates (plaintiffs' expert testified that sixty-five percent black population is necessary), minority interests will have far less impact in the majority of judicial elections because black voters within the crafted district will be participating in the election of only the judge or judges elected in such district.

The volume of cases is also an appropriate consideration in determining the size of circuits, not merely the number of voters in the circuit. The Supreme Court has clearly held that the one-man, one-vote analysis does not apply to judicial elections, *Wells v. Edwards*, 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973); *Chisom*, 111 S.Ct. 2354.

A variety of views has been expressed by the Supreme Court Justices as how to decide whether a violation of Section 2 has occurred in legislative elections. Justice Brennan, writing the plurality opinion of the Court, stated:

> "First, both the language of Section 2 and a functional understanding of the phenomenon of vote dilution mandate the conclusion that the race of the candidate per se is irrelevant to racial bloc voting analysis. Section 2(b) states that a violation is established if it can be shown that members of a protected minority group 'have less opportunity than other members of the electorate to ... elect representatives *of their choice.*'" (Italics in the opinion of the Court).

*Gingles*, 478 U.S. at 67, 106 S.Ct. at 2775.

Justice O'Connor and Justice White wrote of their disagreement with Justice Brennan that the race of the candidate for legislative office is per se irrelevant in identifying racial or polarized voting conflicts. Justice O'Connor, in an opinion joined in by Chief Justice Burger, Justice Powell and Justice Rehnquist, stated:

> "... In my view the evaluation of an alleged impairment of voting strength requires consideration of the minority group's access to the political process generally, not solely consideration of the chances that its preferred candidates will actually be elected. Proof that white voters withhold their support from minority-preferred candidates to an extent that consistently assures their defeat is entitled to significant weight ..."

*Gingles*, 478 U.S. at 105, 106 S.Ct. at 2794.

With the bare bones guidance of the statute and the prophecy that the task would be difficult, this Court will examine the "totality of circumstances" to determine whether there is such polarized voting in Alabama in judicial elections that blacks are denied equal opportunity to elect judges preferred by blacks in the challenged circuits and districts in violation of the Voting Rights Act.

## THE GINGLES TEST

As to the first of the three threshold questions whether the minority group is sufficiently large and geographically compact to constitute a majority in a single member district, defendants concede that such a showing has been made in all the circuits except the Seventh, and in each of the four challenged districts.

■ As to the second prerequisite whether there is sufficient political cohesion of the minority, plaintiffs have fully established a cohesion of the black vote.

The third test requires a determination of whether there is polarized voting so that

minorities have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Defendants contend that in determining whether plaintiffs have met this test, the Court should look at judicial elections and should consider both white on white judicial elections and black on white judicial elections. Plaintiffs contend that the Court should give weight only to elections where blacks are candidates, and the consideration of such elections should not be limited to judicial elections. Plaintiffs would give no weight to elections where no blacks are candidates. The Court is of the opinion that greater weight should be given to judicial elections, *Williams v. State Bd. of Elections,* 696 F.Supp. 1574, 1580 (N.D.Ill.1988), and white on black judicial elections, but this Court will also consider political races generally—white on black and white on white—in seeking to determine the question of whether the political process is open to minority voters. *See City of Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1557–1558 (11th Cir.1987), *cert. denied* 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). The Court must keep in mind the mandate of the statute that Section 2 does not require that minorities be given equal opportunity to elect minority candidates, but that they be given equal opportunity to "elect representatives of their choice." *See Sanchez v. Bond,* 875 F.2d 1488, 1495 (10th Cir.1989).

*Gingles* makes clear that one must examine this question on the basis of the individual challenged circuits and districts. *Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781. However, before analyzing the evidence in the specific challenged circuits and districts, the Court will make some findings which are common to all of the challenged circuits and districts.

## TOTALITY OF CIRCUMSTANCES

### History of Past Discrimination and Contemporary Status

Alabama has a history of discrimination and disenfranchisement of blacks. Plaintiffs correctly point out that blacks were not admitted to the only accredited law school in the state until the late 1960s. Currently, however, blacks are registered to vote in Alabama in approximately the same proportion as whites; in some counties blacks are actually registered in larger percentages than whites. There are more black officeholders in Alabama than in any other state in the United States. The University of Alabama Law School and Cumberland Law School, the largest private law school in Alabama, routinely admit black students and have done so for twenty years or more.

Some evidence of racial appeals in judicial races was presented. One such subtle racial appeal was in the Democratic Party primary in 1982 which involved a newspaper ad run by a white candidate contrasting the pictures of the white candidate and Justice Adams. The appeal was ineffective as Justice Adams was the successful candidate. In the Twentieth Circuit (Mobile), the white candidate in the Democratic primary in the 1990 district judge race made a racial appeal intended to work against Judge Thomas, a black. The tactics in both races were condemned, and Judge Thomas credited his opponent's racial appeal with causing a backlash against the white candidate which aided his election (Depo. of Judge Thomas, Defts' Ex. 52).

The Alabama Democratic Congress has been for years a very effective black political organization which has had a high degree of success in recruiting black candidates and supporting their efforts. It has also been very active in choosing between white candidates and effectively supporting the white candidate so chosen. More recently, the Alabama New South Coalition and other groups have also worked effectively in recruiting and supporting black candidates for public office, and in choosing between white candidates.

### Testimony of Experts Regarding Polarized Voting

■ Dr. Allan Lichtman, plaintiffs' expert, drew his conclusions of racially polarized voting from all kinds of elections where blacks were opposed by white candidates. His analysis was not confined to

judicial elections. He found that in analyzing nearly three hundred elections covering some twenty different public offices during a ten-year period, black voters generally lined up very strongly behind black candidates, whereas white voters generally lined up very strongly behind white candidates.

Dr. Lichtman's findings are shown in Defts' Exh. 99 as follows:

BLACK COHESION AND WHITE CROSSOVER: 1980s ELECTIONS

| Circuit | Black Cohesion % | White Crossover % |
|---|---|---|
| 4th | 85 | 15 |
| 5th | 74 | 21 |
| 6th | 76 | 20 |
| 7th | 79 | 25 |
| 10th | 88 | 22 |
| 13th | 77 | 20 |
| 15th | 70 | 22 |
| 20th | 73 | 20 |
| 23rd | 84 | 22 |
| 26th | 73 | 16. |

This Court finds that Dr. Lichtman's analysis is flawed for at least three reasons. First, Dr. Lichtman analyzed only the elections where a black candidate was in the race. This does not accord with the expressed view of any Supreme Court Justice. This Court has already discussed the view of Justice Brennan in writing the plurality opinion in *Gingles*, 478 U.S. 30, 106 S.Ct. at 2755, in which he writes that the race of the candidate is irrelevant. This Court has also discussed the view of Justice White and Justice O'Connor joined by Chief Justice Burger, Justice Powell and Justice Rehnquist, that the race of the candidate is not irrelevant. No Justice has suggested that only black on white elections are relevant. Justice Stevens in *Chisom v. Roemer*, 111 S.Ct. at 2364, stated:

Any abridgement of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election. As the statute is written, however, the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process.

It is quite a leap from these views of the Justices to that of plaintiffs that the only elections which have any significance are those involving black candidates. Dr. Lichtman's analysis examining only the degree of success of black candidates does not tell us whether blacks have the ability to influence the outcome of the great majority of elections which are those where whites oppose whites.

Second, Dr. Lichtman's analysis is flawed because it fails to recognize that voting polarization in judicial elections is in no way comparable to the races analyzed by Dr. Lichtman. For example, a lawyer and justice of distinction on the Alabama Supreme Court, Justice Oscar Adams, a black, has served on the Supreme Court of Alabama from his appointment by the Governor in 1980 to the present. Justice Adams, called by the plaintiffs, testified that there were "headwinds" in Alabama to the election of black officials and judges. Since Justice Adams' appointment by the Governor, however, he has won elections to the Supreme Court of Alabama in statewide races against well-known white opponents in both the Democratic primary and the general election in 1982 and 1988.

Plaintiffs discount the election successes of Justice Adams because he did not reach the Supreme Court initially by an election but by appointment of the Governor.

Plaintiffs reasonably argue that without the mantle of incumbency, Justice Adams or other blacks would not have succeeded in being elected, and indeed would not have even offered themselves in a costly election contest with the perceived likelihood that they would not have succeeded. However, Justice Adams is not a rarity in reaching his judgeship by appointment. Over two-thirds of the sitting circuit judges—seventy-two of one hundred six—who came to the circuit court in the challenged circuits between 1978 and 1991 were appointed. *See* Defts' Exh. 83. District judges also commonly arrive to their judgeships by appointment. Defts' Exh. 84. As with Justice Adams, these judges, white and black, who are so appointed, are customarily re-elected.

The consistent election victories of Justice Adams are not unique as will be discussed in the specific circuits where blacks have been elected again and again in circuit and district court races.

Third, the analysis by Dr. Lichtman does not take into consideration the fact that the current black circuit judges, all of whom reached the bench by appointment, have with one exception been reelected without opposition. Only Judge Cook in the Bessemer Division of the Tenth Circuit had a contested election. He was opposed by a white opponent shortly after his appointment in 1981. He succeeded in defeating his white opponent.

Although courts have suggested caution in considering elections where candidates run unopposed, *Gingles*, 478 U.S. at 57, 106 S.Ct. at 2769, this does not mean that such elections are irrelevant. In holding that the success of minority candidates in unopposed elections is a factor to be considered, the court in *Sanchez v. Bond*, 875 F.2d 1488, 1494 (10th Cir.1989) stated: "There is an … inference that if an Hispanic is unopposed, he is indeed, supported by Anglos or he wouldn't be unopposed." Black judges who have not drawn opposition have uniformly had the support of the bar as well as their judicial colleagues, and almost without exception have been elected.

Dr. Ronald Webber, defendants' expert, analyzed all *judicial* elections from the time of the enactment of the judicial article, starting his analysis in 1976. He found that in seventy-six percent of circuit judge elections, the black preferred candidate won, and the black preferred candidate won in seventy-seven percent of the district court elections. In state judicial elections, the black preferred candidate won eighty-three percent of the time. These judicial races include white against black races and white against white races. The white against black races are discussed later when the challenged circuits are considered separately.[1]

Because of the high degree of cohesion of the black vote in Alabama, it would be very difficult for a white candidate in a white against white race to be successful without substantial support of black voters. Indeed, in at least two judicial elections where the black political organization endorsed a white candidate, the white candidate received a majority of the black vote even though his opposition was a black. (Judge Owens, an incumbent black, was defeated in 1986 in the general election in the Seventh Circuit when he switched parties and ran as a Republican for a district judge position. In 1980, he had been elected over a white opponent for the district judgeship.) In the Thirteenth Circuit, Ms. Smith lost in a 1980 district court election to a white even though she was the black preferred candidate and had the endorsement of the Alabama Democratic Conference, but in 1986 she ran as an independent; the Alabama Democratic Conference in 1986 endorsed her white opponent and he received a substantial majority of the black vote. Plaintiffs correctly stress the power of incumbency in judicial elections, but in the 1990 circuit judge election in the Fifteenth Circuit, the incumbent white judge was defeated by his white opponent even though the incumbent received sixty

---

1. Dr. Webber determined that a candidate was a black preferred candidate if he received more than fifty percent of the black vote.

percent of the white vote. His opponent was elected by an overwhelming percentage of the black votes.

### Proportion of Black Judges to Black Lawyers

■ Without question, the number of blacks serving in judicial positions in Alabama is far less proportionately than the number of blacks in the general population. On the other hand, blacks still make up a very small percentage of the licensed attorneys in Alabama, the group from which all judges must come. Of more than nine thousand six hundred licensed lawyers in Alabama, only two hundred ninety-five black lawyers have ever been licensed in Alabama, and one hundred three of these black lawyers were admitted between 1986 and 1991. Since most judges have practiced law for several years before seeking a judgeship, the actual pool of black lawyers is even smaller than the raw numbers would indicate.

In the challenged circuits and districts where there are no black judges, the number of black lawyers is so small that the absence of a black judge would not cause one to conclude that the result was due to discrimination. The three circuits in which there is at least one black circuit judge— the Tenth, Thirteenth and Fifteenth—are also the circuits with the most judgeships and with the most black attorneys. In each of these three circuits, the number of black judges substantially exceeds the proportion of black lawyers to white. For example, the Tenth Judicial Circuit has three black circuit judges out of twenty-four. It has no black district judges out of eleven. The proportionate number of black trial judges—circuit and district—is 8.6 percent. Only 3.48 percent of the lawyers are black.

In the Thirteenth Circuit, black lawyers make up 2.1 percent of the licensed attorneys. Of fourteen trial judges, the Thirteenth Circuit has one black circuit judge and one black district judge. Black lawyers have 14.3 percent of the judicial positions, but only 2.1 percent of the pool from which judicial offices will be filled.

In the Fifteenth Circuit, of seven circuit judges, one is black. None of the three district judges is black. The proportion of black lawyers on the trial bench, therefore, is 10 percent, whereas black attorneys make up only 5 percent of the attorneys in this circuit.

Plaintiffs rely on an article cited by one of their experts that "the percentage of black lawyers in a state does not have a statistically significant effect on the probability of blacks serving on the trial bench." Plaintiffs argue that what matters is whether lawyers are appointed or elected. (Pltfs' brief, p. 28). This is an amazing conclusion when applied to the undisputed evidence in this case.

Of the nineteen counties composing the ten challenged circuits, seven counties have not one black lawyer. Surely, it is reasonable to attribute the absence of a black judge in these counties to the absence of any black lawyer, rather than to polarized voting. There are only two lawyers in private practice in the entire Twentieth Circuit and one of them has been practicing only a year. In the Twenty–Sixth Circuit, only two black lawyers reside in the circuit. In the Twenty–Third Circuit, there are only three black lawyers in private practice out of some four hundred fifty lawyers. In the Seventh Circuit, there are only six black lawyers of some one hundred forty-six lawyers.

In a circuit such as the Tenth which has one hundred five black lawyers out of over three thousand, the disproportionate number of black lawyers has far less relevance, but plaintiffs make the amazing argument on the evidence in this case that the number of black lawyers in these ten circuits is irrelevant to the number of lawyers who are serving as trial judges.

In Perry County, which is one of the three counties in the challenged circuits with the highest percentage of black population (64 percent), there is a white district judge, although there are two black lawyers. This is evidence that redistricting, even with nearly 65 percent black population, does not assure black election for any number of reasons.

In employment discrimination cases, it has been held repeatedly that to determine discriminatory exclusion, unskilled positions are compared to a different statistical pool than jobs requiring special training. When "special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Hazelwood School Dist. v. United States,* 433 U.S. 299, 307–308 n. 13, 97 S.Ct. 2736, 2742–2743 n. 13, 53 L.Ed.2d 768 (1977); *see also Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974); *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989); *Peightal v. Metropolitan Dade County,* 940 F.2d 1394, 1404 (11th Cir.1991).

Because blacks have been elected to judgeships in greater numbers than would be the case if there were strict proportionality between blacks and whites eligible for election does not preclude a finding that blacks have not been able substantially to influence elections. The test articulated by Justice Brennan in *Gingles,* which directs that one look beyond the single question of the degree of success of black candidates is particularly required where the minority candidate pool is so small.

### Other Alleged Discriminatory Voting Practices

#### 1. Size of Challenged Circuits

Plaintiffs contend that the size of the circuits works against the election of black candidates because the circuits are so large that it is expensive to mount a campaign, and blacks are disadvantaged because they lack adequate financial resources. However, except for the Fourth, Fifth, Seventh and Twentieth Circuits, all the challenged circuits and districts are single county. Moreover, strong black political organizations have been effective in recruiting and assisting black candidates in political races.

#### 2. Majority Vote and Numbered Place Requirements

There was no evidence that the requirement that a candidate receive a majority of the vote operated in a discriminatory fashion. Although the numbered place requirement in judicial elections came under challenge by the plaintiffs, this Court finds that the numbered place requirement for judges is not based on any discriminatory reason. Aside from the fact that Alabama has elected its judges from designated places at least for the past sixty-five years, it is difficult for the Court to conceive of a more inefficient and damaging way of electing judges than to have them all run in competition with each other. If this system of electing judges is in use anywhere, such evidence was not presented at this trial.

Certainly, Alabama should be allowed to have a system for electing judges where they do not compete against each other at election time. There is a problem now of getting the best qualified lawyers to seek judgeships. This problem would be compounded if potential judicial candidates realized that at election time all judges would have as opponents their colleagues on the bench. Such a system would hardly tend to cause harmonious collegiality on the bench, and the heightened probability that one would have the costly task of running for reelection at the conclusion of each term would make seeking judicial office substantially less attractive.

### Proposed Reconfiguration of Certain Circuits and Districts

In the Fourth and Fifth Circuits, plaintiffs contend that the present makeup of the counties within these circuits results in the dilution of black voting strength. There is no claim that these circuits as originally drawn were so drawn with any racially discriminatory intent. The only reason for the reconfiguration proposed by the plaintiffs would be to create "safe" black districts and "safe" judgeships for black lawyers. It seems questionable that the reconfiguration which plaintiffs propose would actually achieve their purpose. Two of the proposed majority black circuits would have only 51 and 54 percent black voting strength, respectively, after such re-

configuration. The Fourth Circuit already has over 49 percent black voting strength. The best that plaintiffs' expert could do with his districting in the Seventh Circuit was less than 51 percent black. And as noted, plaintiffs' expert, Dr. Lichtman, testified that taking likely turnout into account, a black candidate would need 65 percent black voting population to be expected to win. Whether 51 and 54 percent reconfiguration of circuits or redistricting to provide 50 percent black voting strength would be enough to insure a black's election is questionable, if what is being sought is some guarantee that a black candidate would win or even that a black candidate from the small number in such circuits would seek election. For example, in the Twenty–Sixth Circuit, plaintiffs' witness, Judge Bellamy, testified that only he and one other black lawyer reside in the circuit, and Judge Bellamy is the municipal judge. Mr. Newman, a black attorney, testified that there are only two black attorneys in private practice in the Twentieth Circuit.

The Fourth Judicial Circuit, which is one of the circuits which plaintiffs propose to have realigned, contains five counties and two circuit judges based on caseload and other relevant factors. As noted, the Fourth Circuit is predominantly black with the voting age population being almost exactly fifty-fifty between white and black populations. The Fifth Judicial Circuit, which plaintiffs also propose to realign, is composed of four counties and three circuit judges. In three of the four counties, as the circuit is presently constituted, there is no black lawyer.

*Nominating Commission System*

In four of the ten circuits, the Sixth, the Tenth, the Thirteenth, and the Twenty–Third within which the cities of Tuscaloosa, Birmingham, Mobile and Huntsville are located, respectively, the circuits have by legislative statute a procedure for filling judicial vacancies. These four circuits have forty-five of the sixty-six circuit judgeships in the challenged circuits. When a vacancy occurs in one of these circuits with respect to circuit or district judges, a judicial nominating commission composed of five members from the Bar, Legislature, and the public at large select three lawyers to certify to the Governor. In three of these four circuits the Governor is required to make his selection from the persons so certified. In the other circuit he is not so bound. This relatively newly adopted procedure has resulted in the certification of several black lawyers by nominating commissions and the selection of several black lawyers from those so certified.

Any lawyer—white or black—who receives certification from the nominating commission and is chosen by the Governor has had great success in winning subsequent elections, most often without a contest. This procedure acts as a form of merit system for the appointment of the judiciary in those circuits where it is utilized. The Tenth Circuit with one hundred five black lawyers out of approximately three thousand had two of its three black circuit judges come to the bench through this nominating process.

*State's Interests*

1. Judge's Jurisdiction and Electorate Co-extensive

Alabama has a strong interest in having judges' jurisdiction correspond with their electorate. Several of the judges testified to the serious disadvantage of having the electorate of the judge smaller than the electorate in the judge's jurisdiction. Concerns were expressed that there would be a perception of unfairness if a litigant from the judge's electoral district was opposed by a litigant from outside the district. In all events, there is a strong state interest in having the entire electorate in the circuit have a voice in the judges serving that circuit.

If a district is drawn to get a majority of black voters within a circuit, those black voters not only will have their choice of candidates within the district narrowly restricted, they will also be sacrificing another extremely valuable political right—the right to vote for all of the judges who will be serving as judges in the circuit wherein they live. As Judge Higginbotham stated

in *League of United Latin American Citizens Council v. Clements*, 914 F.2d 620, 649–50 (5th Cir.1990):

These judges all hear and decide their own docket of cases, and their character as single officeholders instead of members of a multi-member body is emphasized by the problems inherent in attempting to break the linkage of jurisdiction and elective base. To do so may well lessen minority influence instead of increase it, surely not what Congress intended when it enacted the Voting Rights Act or its amendments. The current system of electing district judges at least permits voters to vote for each and every judicial position within a given district, generally a county. It is more likely, therefore, that minority voters will have some influence on the election of each judge. Under the district court's order, each voter would have the opportunity to vote for only one judge in each district, the judge whose position was assigned to the subdivision.... the great majority of district judges will be *elected from new voting* subdistricts with negligible minority populations and, consequently, negligible minority political influence on the outcome of those elections."

Judges testifying in the instant case also expressed the view that in some cases where feelings ran high, it would be a distinct advantage to the judge to have the electorate from the whole circuit rather than by smaller districts.

It would be feasible in certain circuits to have judges run from districts within the circuit. However, this Court finds that the present system of requiring judges to run from the entire area which they would serve, if elected, is not racially inspired. Further, the Court finds that a system in which all judges within a circuit are elected by all the voters over which the judge's court has jurisdiction is the logical way to elect judges and has been the chosen method in Alabama for as long as judges have been elected, over a hundred years.

Although one or more of plaintiffs' witnesses expressed the commendable view that no judge would be influenced in his or her decision by the views of his or her constituency, several of the judges who testified spoke of the difficulty for the judge in some cases if he or she had to depend for reelection on a smaller district rather than on the entire circuit.

As the Court said in *Chisom*, 111 S.Ct. at 2367, when a state decides to elect its judges and to compel judicial candidates to vie for popular support as other political candidates do, there is a "fundamental tension between the ideal character of the judicial office and the real world of electoral politics." The *Chisom* Court continued, stating that this tension "cannot be resolved by crediting judges with total indifference to the popular will while simultaneously requiring them to run for elected office. When each of several members of a court must be a resident of a separate district, and must be elected by the voters of that district, it seems both reasonable and realistic to characterize the winners as representative of that 'district." *Chisom*, 111 S.Ct. at 2367. In other words, it is primarily because *judges who run for* political office are subject to the realities of the world of practical politics that they are subject to Section 2 of the Voting Rights Act. This should not be ignored when a court is considering the "totality of circumstances" which give the state a real interest in having judges elected by all voters in the circuit served by the judge.

2. Size of Pool for Selection of Judges

Before analyzing the alleged impairment of black voting strength in the individual circuits, this Court will make one further general observation.

In a number of circuits which plaintiffs ask be divided into districts, the number of black lawyers residing in the circuit is as few as two, five, six, and twelve. Only the Tenth Circuit, Jefferson County, has as many as a hundred black lawyers. Jefferson has one hundred five. Montgomery has fifty-six and no other circuit has more than twenty.

If the purpose of creating districts within the circuit is to get black lawyers elected judges, there is a compelling state interest

in having the pool of black lawyers large enough to give the voters a pool of reasonable size from which to make a selection. Whatever one's race, it is vitally important that the pool from which voters in the circuit must choose be large enough so that a choice can be made from qualified lawyers who are willing to serve as judges. If the purpose of redistricting is merely to give blacks in a newly created district an opportunity to have a significant voice in the political process, as has already been stated, blacks in Alabama at the present time very definitely have a powerful political voice in the election of all judges in the challenged circuits.

## ANALYSIS AS TO SPECIFIC CIRCUITS AND DISTRICTS

### 1. *Fourth Judicial Circuit*

The Fourth Circuit consists of five counties: Wilcox, Dallas, Hale, Perry and Bibb. It has only two circuit judges, both of whom are white. Both came to the bench originally by appointment. Of the five district judges, two are black. In two of the five counties, there are no black lawyers from which to elect a district judge. The Fourth Circuit is predominantly black, and is divided almost fifty-fifty percent between black and white in voting age population. The voter registration rate is approximately the same among whites and blacks in the five counties. No black lawyer has ever chosen to run for circuit judge. Of the two contested judicial elections within the circuit since 1976, the candidate preferred by black voters won one and lost one. Justice Oscar Adams carried the circuit in each of his three elections against white opponents. In statewide judicial elections, the candidate preferred by the circuit's black voters won in the circuit eighty-eight percent of the time.

There are only fifteen black lawyers in all five counties; eleven of the fifteen are in Dallas County. The remaining four counties average only one black lawyer per county. The fifteen black lawyers represent 16.3 percent of the total number of lawyers in the Fourth Circuit. Black judges occupy two of the total of seven judgeships (28.6 percent). (The pool of all lawyers in the Fourth Circuit is only ninety-two, which is restrictive enough without a further reduction.)

### 2. *Fifth Judicial Circuit*

The Fifth Circuit is composed of four counties: Tallapoosa, Macon, Chambers and Randolph. It has three white circuit judges. No black candidate has run for circuit judge. Two of the three judges presently on the bench were initially appointed. For the four contested circuit judge races from 1976 to 1990, the candidate preferred by black voters has prevailed in two of the four. On two of the four occasions, the winner got a larger proportion of the black vote than the white vote. In twenty-six statewide judicial elections, the candidate preferred by blacks in the circuit has won eighty-five percent of the time.

Although the population is 41 percent black, only thirteen of eighty-nine lawyers (14.6 percent) are black. Judge Fort is the black district judge in Macon County. (Judge Fort is also the past president of the District Judges Association in Alabama and the Juvenile Judges Association in Alabama.) There are no black lawyers in the other three counties in the circuit; thus no black lawyers are in the pool from which three district judges are selected to serve in three of the counties. Nevertheless, black lawyers comprise 14.6 percent of the lawyers and hold 14.3 percent of the judgeships in the circuit. There is little difference in black and white registration rates in the counties in the circuit. Voters in the Fifth Circuit as in the Fourth are restricted in their election choices by the presence of only eighty-nine lawyers in the entire circuit.

### 3. *Sixth Judicial Circuit*

The Sixth Circuit is composed of one county, Tuscaloosa, and has a 1990 black voting age population of about 23 percent. Five incumbent circuit judges are white. Only twelve lawyers of the circuit's three hundred sixty-nine are black. Four of the six judges assuming the bench since 1978 were appointed by the governor. As previ-

ously mentioned, Tuscaloosa is now one of the circuits which operates with a judicial nominating commission. A black attorney has twice been among the group of three lawyers nominated by the commission to fill a vacancy on the court. The black attorney is a Democrat and he was not appointed by Republican Governor Hunt. In the eight contested trial judge elections within the Sixth Circuit since 1976, none involved a black candidate. In four of the eight contested elections, the candidate preferred by black voters prevailed. The candidate preferred by blacks in statewide judicial elections prevailed in the circuit twenty-one out of twenty-two times, including all of Justice Adams' contests.

Plaintiffs have suggested that a district be created in Tuscaloosa to guarantee that at least one-fifth of the circuit judges would be elected from 3.25 percent of the lawyers in the circuit.

Presiding Judge Conger stressed the importance of the state's interest in electing its judges from the entire circuit. He testified to his experience of having a section of the circuit strongly opposed to him after a very unpopular decision in that part of the circuit, but support circuitwide enabled him to be reelected. He expressed the view that judges who have to run for reelection need to run circuitwide. He was particularly concerned that the juvenile and family court judge would be elected from the entire circuit. Charles Steele, a black and a named plaintiff in this case, who is a city councilman elected from a district, testified to his belief that he could be elected citywide in predominantly white Tuscaloosa.

#### 4. *Seventh Judicial Circuit*

The Seventh Circuit is made up of Calhoun and Cleburne Counties. The Seventh Circuit has four white circuit judges. Of the five judges who assumed the bench since 1978 three were appointed. In five of eight circuit judge elections, the candidate preferred by black voters won. In the only district judge election conducted from the two county election district, the candidate preferred by blacks won. In statewide judicial elections, the candidate preferred by

black voters won in the circuit seventy-six percent of the time.

In 1980, a black attorney, Mr. Nathaniel Owens, was elected a district judge from the Calhoun–Cleburne district against a white opponent. The district has only a 15.64 percent black voter registration. Prior to Judge Owens' reelection bid in 1986, Judge Owens changed his party allegiance to the Republican Party. Primarily because of this conversion, Judge Owens lost the important endorsement of the Alabama Democratic Conference and thereby the bulk of the black vote went to his successful white Democratic opponent.

There are only six black lawyers in the Seventh Circuit; none in Cleburne County. Black lawyers make up four percent of the one hundred forty-six lawyers in the circuit.

Judge Street testified that he has encouraged qualified black lawyers to run for judgeships, but his efforts have been unsuccessful because the lawyers are well-situated in private practice. This testimony highlights the further fact which runs through all of the challenged circuits, i.e., that one cannot assume that all lawyers or even a large proportion of lawyers—white or black—desire to serve as a judge or to run for this elected office.

Judge Street also said that one of the four circuit judges is a family court judge who performs no other duties than those of the family court. This fact suggests that in order to establish their claim plaintiffs should do so on the basis of three circuit judges, not four. As will be shown, plaintiffs clearly could not prevail and get a majority district if only three circuit judgeships were considered.

The Seventh Circuit was the one circuit where defendants contend that the minority population is not sufficiently large and geographically compact to constitute a majority in a single member district even if the Seventh Circuit is considered as having four circuit judges. *Gingles* requires that any created district be sufficiently large and geographically compact to constitute a majority in the single member district. *See Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766.

Plaintiffs' expert testified that the highest black voter registration percentage which he could achieve in a single member district is 50.18. This district which plaintiffs propose in a *four district* plan is a district with convoluted lines which run through Calhoun County, crossing into Cleburne and takes in part of four different municipalities.

Since plaintiffs' expert, Dr. Lichtman, testified that in order to reasonably assure the election of a black, a district should have approximately 65 percent of its population black, such a district of 50.18 percent black would likely not accomplish any desired result for plaintiffs and would have the disadvantage for blacks which was stated by Judge Higginbotham. If this Court required such a gerrymandering of a district in the Seventh Judicial Circuit, it would be doing so in the teeth of the provision in the statute itself that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion to the population." This Court does not know what meaning would be given this proviso if the gerrymandering sought in judicial circuit Seven were required.

### 5. *Tenth Judicial Circuit*

The Tenth Circuit has twenty-four circuit judges and eleven district judges. Three of the circuit judges and three of the district judges serve a separate division designated as the Bessemer Division. By statute, primary elections are conducted at the division level but general elections are conducted from the county at large.

Of the twenty-four circuit judges, three are black. Each of the three was appointed. Judge Cook of the Bessemer Division was appointed in 1981 after serving on the district bench in Bessemer following his election to the district bench in 1976. Judge Pearson was appointed in the Birmingham Division in 1984 and was elected in 1986 without opposition. Judge Smitherman was appointed in Birmingham in 1991. There are no black district judges. Three of the total of thirty-five trial judges (8.6 percent) are black. By comparison, black

lawyers make up only 3.8 percent of the lawyers in the Tenth Circuit. Plaintiffs seek to have approximately 33 percent of the judges come from a court-ordered district although black lawyers make up less than 4 percent of the lawyers in Jefferson County.

In twenty-one of twenty-three (91 percent), contested circuit court elections, and in nine of eleven (82 percent) contested district court elections, the candidate preferred by black voters was elected. In those thirty-four elections, the choice of black voters prevailed in thirteen of sixteen elections in which white voters and black voters differed in their preferences. In the twenty-six statewide judicial elections since 1976, a candidate preferred by black voters has won on each occasion, including Justice Adams' three elections.

As previously noted, Jefferson County, the Tenth Circuit, is one of those circuits where a judicial nominating commission is in operation. Between 1978 and 1991, fifteen of nineteen new circuit judges assumed the bench by appointment, and eight of twelve new district judges came to the bench through the same route. The bench and bar through the nominating commission process have played a prominent role in recommending qualified attorneys to the Governor for nomination to the bench. Both Judge Pearson and Judge Smitherman were recommended to the Governor through the nominating commission. Two of the five persons presently serving on the nominating commission are black. A black lawyer has served as president of the Birmingham Bar, the largest circuit bar in Alabama.

Plaintiffs rely heavily on two 1988 district court elections where black Democratic candidates Judge Anthony and Mr. Chambliss were defeated by white Republicans.[2] Defendants point to several factors other than race which played a prominent role in the success of the white Republicans. The most revealing statistic concerning these two races is that the black Democratic judicial candidates each received ap-

---

**2.** Judge Anthony is now a municipal court judge   in the city of Birmingham.

proximately 24 percent of the white vote while Governor Dukakis got only 17 percent of the white vote in Jefferson County. The top white Democratic vote getter in Jefferson County's judicial races in 1988 received less than 40 percent of the white vote in the circuit. The 1988 races clearly had results which were dictated by the strong preference of a majority of voters in Jefferson County for Republican candidates rather than Democratic. This preference obviously was not restricted to white Republicans who were running against black Democrats.

After Judge Cook was appointed a circuit judge in 1981, he faced an election in 1982. He won the election over a white opponent and was unopposed in the general election. Judge Cook had no opposition in 1988.

If the Bessemer division is considered a separate election district, not only has Judge Cook repeatedly won elections, but also candidates Judge Anthony and Mr. Chambliss have won the nomination of the Democratic Party following their election in the Democratic primary, and each of them won a majority of the votes in the general election in the Bessemer division. Based on the success of Judge Anthony and Mr. Chambliss in their races in the Bessemer division compared to their defeats in 1988 in the circuitwide general elections, it is predictable that black candidates for judgeships in the Bessemer division would fare better if the general election were also by division. It appears to be something of an accident that the races are not so conducted uniformly in both primary and general elections. The racial composition of the Birmingham and Bessemer divisions is approximately the same, however, 30 percent black in the Birmingham division and 35 percent black in the Bessemer division. Party preference rather than race is the apparent difference in the two divisions. Since blacks usually run as Democrats, they would probably do better because of their political allegiance by running in only the Bessemer division. But this is hardly what Section 2 was enacted to accomplish.

Justice Adams has won handily in the Bessemer Division in each of his elections.

### 6. *Thirteenth Judicial Circuit (Mobile)*

The Thirteenth Circuit has a black circuit judge, Judge Kennedy, and a black district judge, Judge Thomas. Judge Kennedy was appointed by the Governor in 1979 and has twice been elected without opposition. Judge Thomas was appointed in March of 1990 to fill a vacancy, and immediately had to stand for election. He was elected over two formidable white opponents.

The two black judges on the trial bench in the Thirteenth Judicial Circuit out of fourteen trial judges means that black lawyers occupy 14.3 percent of the trial bench in the Thirteenth Circuit although they represent only 2.1 percent of the lawyers in the Circuit. Of nine hundred thirty-four lawyers in the Thirteenth Circuit, only twenty are black. Thus ten percent of the black lawyers are trial judges and less than two percent of the white lawyers are judges. For this Court to require the creation of a predominantly black district from which 25 to 30 percent of the judges in the Thirteenth Circuit would be elected hardly seems necessary to have black lawyers fairly represented on the bench in the Thirteenth Circuit, or to give black voters an effective voice in judicial elections.

Again, although plaintiffs point to the fact that both Judge Kennedy and Judge Thomas initially came to the bench by appointment, of the six circuit judges in the circuit taking office in the period between 1978 and 1991, all except one were so appointed. The situation with Judge Thomas is also typical in that three of the five district judges during the same period came to the bench by appointment.

Black voters in the Thirteenth Circuit have again been successful in electing their preferred judicial candidates. In the four circuit court elections, the candidate favored by black voters prevailed on each occasion. In district court elections where there have been twelve contested elections, the black preferred candidate has won seventy-five percent of the time. In statewide elections, the Thirteenth Circuit vote has gone to the black preferred candidate

eighty-five percent of the time. Justice Adams has carried Mobile County on each of the three times that he has run.

The only black lawyer to lose a judicial election in Mobile County was Ms. Frankie Field Smith, who lost to a white in a district court race in the 1980 Democratic primary runoff and to two whites in a 1986 district court general election. Although Ms. Smith was the black preferred candidate in 1980, she was not in 1986 when she ran as an independent, and her white Democratic opponent got the endorsement of the Alabama Democratic Conference and received a substantial majority of the black vote. Smith's 1986 defeat does not show the powerlessness of black voters; it is another example of the success of the black preferred judicial candidate.

Defendants understandably put significance on the recent election of Judge Thomas to a full term on the district court. Judge Thomas was opposed in the Democratic primary by a well known white lawyer, who was a former legislator and chairman of the Mobile legislative delegation, and with strong family ties throughout Mobile County. Judge Thomas defeated his white opponent by receiving approximately forty percent of the white vote. In the general election, Judge Thomas faced a well known Republican lawyer, and was again successful, receiving approximately forty-four percent of the white vote. Significantly, the white Democratic candidate for Governor in that same election received only thirty-five percent of the white Mobile vote against his white Republican opponent. Judge Thomas testified that his vigorous campaigning in white areas was critical to his success.

### 7. *Fifteenth Judicial Circuit (Montgomery County)*

While Montgomery has a black voting strength of approximately 38 percent, only 5 percent of the lawyers in the circuit are black. One of the circuit's seven circuit judges is black. None of the three district judges is black. Black representation on the overall trial bench is thus 10 percent.

Judge Price, the black circuit judge, after serving for a number of years in the district attorney's office, was appointed to the circuit bench in 1983, and was elected without opposition to full terms in 1984 and 1990. Once again, Judge Price is among the majority of circuit and district judges in the Fifteenth Circuit who initially reached the bench through the appointment process. Only two of nine trial judges in the 1978–1991 period reached the bench other than by the appointment process.

Black voters in the Fifteenth Circuit have been highly successful in securing election for their preferred candidate. In eight of the ten trial judge elections analyzed by Dr. Webber, the black preferred candidate prevailed. Justice Adams carried Montgomery County handily in his three contested elections, and statewide judicial candidates preferred by blacks have won the county vote on twenty-two of twenty-six occasions. Plaintiffs urge that in order to give blacks an opportunity to elect representatives of their choice, this Court should create a district with a substantial black majority in the electorate so that over 40 percent of the circuit judges and 33 percent of the district judges would come from the 5 percent of black lawyers in the circuit. As shown by the statistics, blacks have been successful in getting the candidates of their choice elected in over 75 percent of the contested judicial elections in the Fifteenth Circuit. In no way are they denied equal access to the political process in judicial elections in the Fifteenth Circuit.

Plaintiffs correctly stress the power of incumbency in judicial elections. Judge Phelps testified, however, that in the 1990 election between the Republican incumbent judge and his Democratic opponent, both white, the Republican received sixty percent of the white vote. The Democrat won because he got almost all the black vote. This is further evidence that blacks have full and effective participation in judicial elections.

With such a record of success in all judicial elections, with 10 percent of the trial judges in the Fifteenth Circuit being black although black attorneys make up only 5 percent of the bar, this Court does not believe it was Congressional purpose to

require a special district in the Fifteenth Circuit, thereby denying the majority of blacks in the Fifteenth Circuit any voice in the election of trial judges who would be elected outside the newly created district, or if plaintiffs' underlying premise were correct, thereby denying the minority of whites in the newly created district "equal access to the political process." Polarizing judicial districts by race within circuits clearly would reduce access of minority voters—white and black—in the districts after such court required restructuring.

Plaintiffs' expert, Mr. Jerry Wilson, has proposed a single predominantly black district in the Fifteenth Circuit which would have approximately a 55 percent black majority and which would elect three circuit judges and one district judge. Once again, plaintiffs' expert, Dr. Lichtman, testified that a district is not "safe" for black candidates unless the district has 65 percent black registered voters, but assuming that such newly created district for the purpose of getting more black judges achieved its purpose, the blacks outside the district would have their voting strength substantially diminished, and in actuality so would all blacks as to most of the elected judges.

### 8. *Twentieth Circuit*

In the Twentieth Circuit, composed of Houston and Henry Counties, there are three white circuit judges. Only five of the one hundred forty-seven lawyers in the circuit are black. All of these reside in Houston County. Of the five black lawyers, only two are in private practice, a husband and wife team. Mr. Newman, the husband in the husband and wife team, testified that his wife has only had active experience as an attorney for about a year. The two district judges are white; however, there are no black lawyers in Henry County, so the district judge in Henry County must come from the very limited number of white lawyers.

Mr. Newman testified that he has not considered applying for appointment or running for the circuit court. He does not think he would be successful.

The black vote is diligently sought by judicial candidates in the Twentieth Circuit.

The circuit judge candidate preferred by blacks has been successful in two of the four contested elections since 1976, and the statewide judicial candidate favored by black voters has won the circuit vote seventeen of twenty-six times.

Plaintiffs propose that a black "safe" district be created so that at least one circuit judge is black. Thus, plaintiffs seek to have one-fourth of the judges come from a pool of only two or five black lawyers in the entire circuit. If judges are to be elected by circuits or districts, the state has a compelling interest that voters have a choice that is not so restricted as would be the case in the Twentieth Circuit.

### 9. *Twenty-third Judicial Circuit*

The Twenty-third Judicial Circuit, which consists of Madison County, has six circuit judges, all of whom are white. Three of the six judges who came to the bench from 1978 to 1991 came by appointment. Of four hundred forty-five lawyers in Madison County, fifteen (3.8%) are black. However, plaintiffs' witness, Mr. Lampley, a black lawyer, testified that only three black lawyers are in private practice in Madison County.

In the few contested judicial elections within the Twenty-third Circuit the candidate preferred by black voters prevailed in three of the three circuit court elections and in four of the six district court elections. In statewide judicial elections, the county vote has gone with the candidate preferred by blacks sixty-five percent of the time. Justice Adams has carried Madison County except for the 1982 first primary when he finished second in a three man race to a well-known Huntsville lawyer, a past president of the Huntsville bar.

The Twenty-third Circuit is one of the circuits which has a nominating commission system. Mr. Lampley, a black attorney, testified that when he applied for a judgeship to fill a vacancy, he had been practicing law for only three or four years. He acknowledged that the white candidates who have been elected in Madison County usually had black support.

In the one contested district court election involving a black candidate, the white candidate received the co-endorsement of the Alabama Democratic Conference. She had been a lifetime resident of Madison County with strong family connections throughout the county. The testimony was undisputed that she campaigned far more vigorously and with much stronger political connections than her black opponent.

Judge Smith, a circuit judge in Madison County, urged that the county not be districted. With twenty percent of Madison County's population black, presumably Madison County would have one majority black district. This would mean that a black would have a five to one chance that his case would be heard before a white judge for whom the black had no vote. Judge Smith testified that at present blacks are the margin of victory in the Democratic primary. Judge Smith expressed concern as to what such polarization by race would do for fringe groups. He did not see such polarization as a step forward but rather as a step backward for blacks. Their political influence would be lessened, not increased.

### 10. *Twenty-sixth Judicial Circuit*

The Twenty-sixth Judicial Circuit is composed of one county, Russell County. Out of fifty-three attorneys who have a practice in Russell County, only four are black. Plaintiffs' witness, Judge Bellamy, one of those black lawyers, who is also a municipal court judge, testified that only two of the four black lawyers actually reside in Russell County.

All judges in Russell County, at least since 1978, have taken the bench by appointment. District Judge Johnson, while acknowledging the importance of incumbency, testified that in his view a black lawyer could win an open seat election in Russell County. Judge Johnson discussed the electoral success which black candidates have had in at large elections in the county including election to the county school board. Judge Bellamy testified regarding his own election to the county Democratic executive committee over a popular white officeholder, a county commissioner, in a heavily white district.

Judge Bellamy expressed the opinion that the numbered place feature of the election system plays a legitimate role and function in the interest of blacks by minimizing voter confusion.

Blacks constitute 36 percent of the voting population in Russell County. Plaintiffs contend that in order to comply with the Voting Rights Act, this Court should create a single member district to assure that a black candidate would be elected circuit judge and another black candidate would be elected district judge. Not even in *Gingles*, where the Court was considering legislative districting with an unlimited number of minority persons in the pool from which an elected official could come, did the Court suggest any such result. Once again, if Section 2 of the Voting Rights Act, as amended, is to be construed to require the results sought by plaintiffs in this circuit, what is the meaning of the proviso in the amended section that nothing in the section is to be construed as establishing a right to have members of a protected class elected in numbers equal to their proportion in the population?

### SUMMARY REGARDING THE CHALLENGED CIRCUITS AND DISTRICTS

Where blacks presently occupy 7 percent of the trial judgeships in the challenged circuits and districts compared with 3.9 percent of black lawyers in these circuits and districts; where there are no black lawyers in seven counties of the nineteen in the challenged circuits, thus precluding the election of a black to the district court in those counties; where there are increasing numbers of black attorneys, approximately one-third of the black attorneys have been licensed in Alabama within the last five years; where the black minority in Alabama has had increasing political impact in all political contests; where for many years there has been no impediment to black voting in Alabama and blacks and whites are registered in comparable percentages; where blacks have been largely successful

in having the candidate of their choice win in contested judicial elections; where in circuits which have two-thirds of the circuit judges there are nominating commissions which have shown a genuine desire to get a judicial appointment for the best qualified attorneys—white or black; where there is a legitimate state interest in having a judge's jurisdiction correspond to his constituency; where the numbered place system appears to this Court to be the only sensible way to conduct judicial elections and the state has a compelling interest in continuation of this system; where Alabama's procedure for electing judges at large (one hundred forty-two years) and for numbered places (sixty-five years) was instituted and continued with no racial discriminatory intent; where the size of judicial circuits and districts were established with no racial discriminatory intent and is based on caseload and other legitimate factors; where there is a compelling state interest that the pool of potential candidates be large enough to give voters a reasonable choice, this Court concludes that no violation of the Voting Rights Act has occurred.

In reviewing the Supreme Court opinion in *Chisom*, 111 S.Ct. 2354, the reviewer in the Harvard Law Review wrote: "Judges evaluating a dilution claim should ask whether election schemes, considered as a whole, have reduced the minority vote to an empty formality and prevented minorities from substantially influencing election outcomes. Such an approach would move all minorities closer to the ideal of full and effective participation in the political arena." 105 Harv.L.Rev. 409, 418 (1991). No one could find that election schemes in Alabama have reduced the minority vote to an empty formality or prevented minorities from substantially influencing election outcomes. As one witness after another has testified, the black electorate is decisive in "influencing the outcome" of elections and having their preferred candidate elected. This is a great credit to the sagacity of the black political leadership in Alabama. The action sought by plaintiffs in this case would probably succeed in getting a small increase in the number of blacks elected to judgeships at a cost of diminished black political clout in all other judicial elections. As other judges have stated, the polarization of the black vote in judicial elections could have the unwanted repercussions discussed by Judge Smith with regard to the Twenty-third Circuit.

During a long part of the history of Alabama, blacks were effectively denied the vote. The Voting Rights Act of 1965 greatly accelerated the growing number of black voters. As the testimony in this case makes clear, for many years there has been no impediment in Alabama to blacks voting. When blacks could not vote in any substantial numbers, the chance of blacks receiving judicial appointment or election was practically non-existent. Their ability to influence elections was also minimal. This is simply no longer remotely the case in Alabama.

It does not require polarization of the races by districts to achieve black influence in the election process of judges. This Court agrees with Judge Smith and others that such polarization on balance could well be a step back in black political influence. *See League of United Latin American Citizens Council v. Clements*, 914 F.2d 620, 649–50 (5th Cir.1990).

## CHALLENGE AS VIOLATION OF FOURTEENTH AND FIFTEENTH AMENDMENTS

■ In its amicus brief, the United States supports plaintiffs' challenge that the at-large, numbered place system of electing judges in Alabama has been continued, at least in part, for racially discriminatory reasons in violation of the Fourteenth and Fifteenth Amendments of the United States Constitution. The Government acknowledges that the institution of the at-large, numbered place system was not driven by any desire to dilute black voting strength. The Government concedes that such system for the election of judges dates from as early as 1915. Alabama enacted the first statewide legislation requiring the use of at-large, numbered positions for the election of circuit judges in 1927. At that time there were no black

attorneys in Alabama and blacks were largely disenfranchised. The historical evidence is clear that the numbered place law was a measure promoted by the conservatives in the Democratic Party, which saw its dominance threatened in the 1926 election by Progressive—Prohibitionist—Ku Klux Klan factions which had won elections.

### 1. Act 221 and Numbered Place System

The Government argues that even though the at-large numbered place system had no discriminatory purpose when put in place, and even though judicial candidates have run at large for designated places, rather than in a "huddle," without change for sixty-five years, that Alabama maintains this system for electing judges for racially discriminatory purposes, and has done so at least since 1961.[3] In 1961, the Legislature enacted Act 221 which required that numbered places be used to elect virtually all multimember offices in the state. The Government argues that even though all judges were required to be elected under an at large, numbered post election system prior to the passage of Act 221 and even though Act 221's passage had no effect on the system of electing judges, such facts are not relevant "to the question of the state's motive in 1961 for requiring at large, numbered post judicial elections." This reasoning seems to stand logic on its head. Whatever one may find as to the reason for Act 221 requiring at large, numbered places for elections generally, the Act simply did not affect judicial elections.[4]

The Government's principal reliance for its argument that Act 221 was racially motivated is based on a statement by Mr. Mizell at a meeting of the Democratic Executive Committee in 1962. Mr. Mizell was urging that the method of electing members to the Democratic Executive Committee be changed so that candidates would run for numbered places. In referring to Act 221, he stated that the Legislature has changed voting procedures to numbered places "to protect the white people of Alabama." He also stated that the Legislature acted because of a concern in Madison County after a number of black candidates "might near got elected" in a city council election where there were no numbered places.

The undisputed facts are: Mr. Mizell was not a member of the Legislature. He was a very vocal segregationist. He had nothing to do with the initiation or passage of Act 221. Act 221 was not inspired by any concern that numbers of blacks were running and being "might near" elected. There was one black candidate in a field of forty for five city council seats in Madison County. The black candidate ran twenty-fourth. These inaccuracies by Mr. Mizell

---

**3.** Plaintiffs have offered no evidence that the at-large voting system for electing judges was racially motivated. The at-large system (i.e., vote by all electors in each circuit for all circuit judges, as opposed, for example, to election by single-member districts) was mandated in 1850 by amendment of the Alabama Constitution. There has been no change. In 1974, the Judicial Article became a part of the Constitution providing for circuit and district judges. This Article also provided that "all judges shall be elected by vote of the electors within the territorial jurisdiction of their respective courts." This Court finds no discriminatory purpose in the at-large voting system.

**4.** In *Dillard v. Crenshaw County,* 640 F.Supp. 1347 (M.D.Ala.1986), Judge Thompson found in considering a challenge to the use of at-large, numbered place elections for county commissioners that in 1961 the legislature "refashioned the at-large electoral system then in use in many counties and cities throughout the state" by means of numbered place laws. Judge Thompson concluded that such "refashioning" was racially inspired. Judge Thompson's finding did not directly involve judicial elections. Plaintiffs acknowledge that there was no such refashioning or change in the statewide practice of electing judges at-large and by numbered places, which had been the law statewide in Alabama at least since 1927.

Judge Thompson's finding was made at a preliminary injunction hearing in which defendants did not offer any evidence to dispute the view of plaintiff's expert who relied in large part on the discredited statement of Mr. Mizell. In this case, defendants have offered a great deal of credible evidence that the 1961 statute, Act 221, was not racially motivated. Although evidence presented in this case makes it extremely questionable that Act 221 had any racial motivation in any election, this Court only holds that it had no such purpose in judicial elections.

hardly create confidence in other portions of his statement.

Mr. Mizell's statement as to the reason for Act 221 is not corroborated by any other account of the bill. Although plaintiffs' experts indicate that Act 221 was little publicized, implying that Mr. Mizell's account stands largely unrebutted in contemporaneous reporting, at least eight news articles discussing Act 221 appeared between May and September 17, 1961 in the Huntsville Times, Birmingham News, Mobile Register, and Montgomery Advertiser. Only two purposes were ever attributed to the bill. The Huntsville Times on May 31, 1961 wrote that the objective of the bill [was] to prevent malfunction of voting machines due to makeshift throwout straps being applied to them, and also to prevent blowing of fuses even when such straps are not on the machine but persons vote for more than one in the same race" (as in the 1960 Madison County primary). The Birmingham News on May 10, 1961 wrote that the bill was "aimed primarily at the possible failure of the Legislature to create new congressional districts"—that is—"if all candidates for Congress were forced to run statewide, then they would run for numbered places, rather than in a huddle for eight congressional seats." (Alabama was to lose one congressional seat.) The Huntsville Times of May 11, 1961 and May 31, 1961 explained both purposes. Nowhere in any of the news coverage was any racial purpose suggested for Act 221. Newspapers fully reported that other measures considered by the 1961 Legislature were racially motivated, wherever they were so motivated.

As defendants point out, if Act 221 was inspired by fear of successful black candidates, why did the Act make an exception for school board, county commission, city council, etc., in Jefferson County? The exception removed all Jefferson County offices from numbered places, leaving only judicial offices and congressional seats in the numbered place category. Jefferson County had a substantial and growing black population, far more substantial than Madison County.

Finally, the authors of Act 221, testified that the Act had no racial motivation. Mr. Roberts, one of the two authors, testified in rejecting Mr. Mizell's claim that the Act was inspired by concern of a black being "might near" elected in Huntsville, that the black, who actually ran twenty-fourth, was a client and Mr. Roberts had given financial support to his campaign. Mr. Roberts testified that he barely knew Mr. Mizell and did not regard him as particularly reliable or knowledgeable about Act 221. Mr. Roberts was very clear that the bill had no racial discriminatory purpose.

Dr. Rogers, plaintiffs' expert, testified that Mr. Archer, another author of the bill who was also from Madison County, told him that the Act was unrelated to black voting. "The testimony of the actual decision makers" must be regarded as particularly persuasive in an intent inquiry, *Price v. Austin School Dist.*, 945 F.2d 1307, 1318 (5th Cir.1991), especially where the only contrary statement comes from one with his own agenda and is full of other inaccuracies.

Mr. Bob Ingram, a highly respected reporter who covered the 1961 Legislature and wrote about the Act in the Montgomery Advertiser, September 12, 1961, remembers the numbered place law as he reported it in 1961, as a "redistricting measure" linked to the congressional elections. Plaintiffs offered no witness to rebut these observations by knowledgeable contemporaries of the time of the Act's enactment.

Finally, nothing in the evidence suggests that anything relating to judicial elections was of concern to the 1961 Legislature, and again Act 221 made absolutely no change in judicial elections.

#### 2. *Judicial Reform in 1970 as Evidence of Violation of Fourteenth and Fifteenth Amendment*

Plaintiffs argue that those who succeeded in passage of the Judicial Article in 1970 continued to maintain numbered place systems in Alabama and the popular election of judges in order to dilute black voting strength. The argument rests on the fact that the sponsors of the Judicial Article did not reevaluate the numbered place system

or the at large system for electing judges when the state adopted the Judicial Article, nor did they implement a change that judges be appointed rather than elected.

Sponsors of the Judicial Article, including then Chief Justice Heflin, acknowledge that they did not seriously consider providing in the Judicial Article that judges be appointed rather than popularly elected because they believed that such a provision would generate strong opposition. They were certainly correct. Alabama has always had a strong populist base. Alabama elects many offices which in other states are appointed; e.g., state school superintendent, many county school superintendents, circuit court clerks, state auditor, state secretary of state, state treasurer, etc. The fact that Alabama voters choose to require election for these positions does not suggest that the choice is racially motivated. They have been elected offices for a century. Whatever the merits of appointment rather than election of judges—and states go both ways and with combinations of both—it would have been most unwise to put into the Judicial Article, which had to be approved by the voters, a very controversial provision which certainly would have generated opposition from many Alabamians who obviously have believed since 1850 that they should be allowed to elect their judges. Moreover, one wonders how an appointive system in 1971 was supposed to have been perceived as leading to more black judges when in 1971 there was less than one percent of Alabama attorneys who were black.[5]

As to plaintiffs' argument that the failure of the proponents of the Judicial Article to propose an alternative to the at-large, numbered place system indicates a purpose to discriminate, the same rebuttal applies as to the failure to propose the appointment of judges. Since 1850 when judges were first elected, judges were elected from an electorate that was contemporaneous with their jurisdiction. The fact that the proponents did not attempt to change this well established system and inau-gurate a very questionable system where judges would be elected by only a part of the electorate in the jurisdiction over which they presided, proves nothing.

This Court has expressed itself as believing that a worse system could not be imagined than abandoning the numbered place system and having all judges compete with one another and with new aspirants at election time. This indeed would probably result in "slating" and plaintiffs do not contend that this vice is in the present system.

## SECTION 2 DOES NOT VIOLATE THE CONSTITUTION

Defendants argue that even though the Supreme Court in *Chisom* and *Houston Lawyers Ass'n* held that Section 2 of the Voting Rights Act applied to judicial elections, the Supreme Court did not resolve the question of whether the statute as so construed violates the Constitution. Defendants base this reasoning on the statement in *Chisom:* "Our decision today is limited in character.... No constitutional claims are before us." *Chisom*, 111 S.Ct. at 2361. In the footnotes accompanying the quoted statement, however, the Court makes clear the type of distinct constitutional claims that were involved in certain of the other cases before the Court which were not present in the cases before the Court in *Chisom.*

For example, in *Wells v. Edwards*, 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973), the Court had the question of whether election of state supreme court justices by districts violated the Equal Protection Clause. In *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Court had the question of whether a population differential among districts established a prima facie case of invidious discrimination under the Equal Protection Clause. In *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), an issue was whether at-large system of municipal elections violated black

---

5. Judge Kennedy, a black circuit judge from Mobile, testified that it was the black representatives on the Judicial Reform Commission who sought and obtained a district judge in each of Alabama's sixty-seven counties.

voter rights under the Fourteenth and Fifteenth Amendments.

The Court in *Chisom* was not laboring to determine whether Section 2 of the Act applied to judicial elections, remanding those cases to the trial courts "for further proceedings consistent with this opinion," and leaving unanswered whether the Act if applied to judicial elections was unconstitutional. Implicit in the *Chisom* and *Houston Lawyers' Ass'n* decisions is the Court's conclusion that Section 2 as amended when applied to judicial elections does not violate the Constitution.

## CONCLUSION

In conclusion, this Court finds that the at-large numbered place election system in the jurisdictions at issue and the present circuit court configuration do not violate Section 2 of the Voting Rights Act nor the Fourteenth and Fifteenth Amendments to the Constitution of the United States.