Jennie SANCHEZ, Stella Sanchez, Adeline Sanchez, Dora Trujillo, and Charles Jaramillo, Plaintiffs–Appellants,

v.

William BOND, County Clerk and Recorder of Saguache County, Colorado, Cecil Hall, Keith Edwards, Chuck Grant, Board of County Commissioners for Saguache County, John Price, County Chairman of the Democratic Party for Saguache County and Robert Felmlee, County Chairman of the Republican Party for Saguache County, Defendants–Appellees.

No. 87–2860.

United States Court of Appeals, Tenth Circuit.

May 30, 1989.

Jose Garza, Mexican American Legal Defense and Educ. Fund, and Antonia Hernandez, Norma V. Cantu, Judith A. Sanders–Castro, and Albert H. Kauffman of MALDEF, San Antonio, Tex., with him on the brief, for plaintiffs-appellants.

S. Morris Lubow, Denver, Colo., and Robert S. Crites, of Crites and Farish, Monte Vista, Colo., with him on the brief, for defendants-appellees.

Before MOORE and ANDERSON, Circuit Judges, and BROWN,* District Judge.

WESLEY E. BROWN, Senior District Judge.

This is an appeal of a vote dilution case. Plaintiffs–Appellants are voters from Sa-

---

* The Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

guache County, Colorado, who contend that the at-large election procedure used to elect county commissioners in Saguache County impermissibly dilutes Hispanic votes in violation of Section 2 et seq. of the Voting Rights Act, as amended, 42 U.S.C. § 1973 et seq. After hearing the evidence, the district court concluded that the plaintiffs had failed to prove a violation of § 2 and entered judgment in favor of the defendants. We affirm.

Appellants raise two main arguments on appeal. First, they contend that the district court misinterpreted the Supreme Court's ruling in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), and, as a result, applied erroneous standards of law to the evidence. Second, appellants argue that the trial court's factual findings were clearly erroneous. In order to address these claims, we first review some of the evidence presented in the district court.

Saguache County consists of approximately 3,000 square miles in central Colorado. In 1980, the county had a total population of 3,935, of which 41% were Hispanics[1] and 57% were Anglos.[2] Census records indicate that 36% of the voting age population was Hispanic in 1980. Despite the number of Hispanics in the county, no Hispanic has ever been elected to the Saguache County Commission. Colorado state law requires the division of each county in Colorado into three compact districts for the purpose of electing a board of county commissioners. One commissioner from each district is elected by the voters of the whole county. Each commissioner must be a resident of the district he or she is elected to represent.

The plaintiffs presented several witnesses who testified as to the political situation in Saguache County. The witnesses testified that the community was racially polarized and that Hispanics were unable to elect candidates to office in county-wide races. Several of the plaintiffs' witnesses

had been defeated in county elections and stated their opinion that their losses were due to bloc voting by Anglo voters.

Plaintiffs also presented the testimony of Dr. Robert Brischetto, an expert on voting patterns and election systems. Dr. Brischetto stated his opinion that Hispanics in Saguache County had less opportunity than Anglos to participate and to elect candidates of their preference. Dr. Brischetto concluded that this condition was due to the at-large election procedure used in Saguache County elections. Dr. Brischetto's conclusion was based in large part upon a statistical study of selected political contests. He examined ten races in which Anglo and Hispanic candidates ran against each other. Using the voting results from each precinct, Dr. Brischetto compared the proportion of Hispanic voters in each precinct with the proportion of support received by the Hispanic candidate. He found a high correlation between the two, leading him to conclude that voting in nine of the races was "highly polarized." Dr. Brischetto stated that, in his opinion, whites voted as a bloc to systematically defeat Hispanic candidates. He also concluded that Hispanics were politically cohesive, noting that his study showed that Hispanics generally vote as a bloc for Hispanic candidates.

The defendants' expert gave his opinion that voting in Saguache County was polarized along party lines, suggesting that party affiliation was a better predictor of how a voter would vote than was the race of the voter. The defendants also presented testimony from lay witnesses, who stated that a majority of the Democratic party in Saguache County was made up of Hispanics and that Hispanics controlled the nominating process in the party. The witnesses also testified that an Anglo could not be nominated by the Democratic party without the approval of a group of Hispanics that included several of the plaintiffs. Additionally, the witnesses gave their opinion that Hispanics in Saguache County were

---

**1.** "Hispanic" was used in the district court to mean persons of Spanish origin. The term was used interchangeably with the terms Mexican American, Chicano, and Spanish surnamed.

**2.** "Anglo" refers to non-Hispanic whites.

not a single cohesive group but consisted of several politically distinct groups. One of the defendants, an Anglo county commissioner, testified that he received substantial Hispanic support in his election to the commission.

Results from county elections dating back to the 1970's were used by both sides in the trial court. Plaintiffs pointed out that no Hispanic had ever won a contested county-wide election and that three Hispanics had run for county commissioner and had been defeated. The defendants showed that a few unopposed Hispanics had won county-wide positions. The defendants also noted that Democratic candidates had been regularly elected to county positions, including the county commission.

## I. Section 2 and the Gingles requirements

Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any state or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The Supreme Court examined § 2 in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Noting that amended § 1973 repudiated the "intent test" of *Mobil v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the *Gingles* court stated that the question § 2 poses is whether, *as a result of* a challenged electoral practice, plaintiffs do not have an equal opportunity to participate in the electoral process and to elect candidates of their choice. The court found that the essence of a § 2 claim is that a certain electoral practice interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and white voters to elect their preferred representatives. *Gingles,* 478 U.S. at 48, 106 S.Ct. at 2765.

In order to address a claim under § 2, a court must assess the impact of the contested election practice on minority electoral opportunities by assessing certain objective factors. The Senate Report accompanying the 1982 amendment to § 2 lists several factors that may be relevant to a § 2 claim:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political

subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, reprinted in 1982 U.S.Code Cong. & Ad. News 177, 206–07.

Several points should be kept in mind in applying the foregoing set of factors. First, the list is exemplary, not exclusive. The court may consider any relevant factors in reaching its conclusion. Second, there is no requirement that any particular number of factors be proved or that a majority of them point one way or the other. Third, whether the political processes are "equally open" depends on a searching practical evaluation of the past and present reality and upon a functional view of the political process. *Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764.

The Supreme Court noted several limitations on actions brought under § 2. The court stated that election devices, such as at-large elections, may not be considered *per se* violative of § 2. Also, the combination of an electoral mechanism and the lack of proportional representation alone does not establish a violation. And finally, the existence of racial bloc voting may not be assumed; plaintiffs must prove it. *Gingles,* 478 U.S. at 45–46, 106 S.Ct. at 2764.

In an attempt to give lower courts a framework for analyzing § 2 claims, the Supreme Court set forth three "necessary preconditions" which must be present if plaintiffs are to prevail on their vote dilution claim. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district. Second, the minority group must be able to show that it is politically cohesive. Third, the minority group must show that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. A white bloc vote that normally will defeat the combined strength of minority votes plus white "crossover" votes is said to be legally significant white bloc voting. *Id.* at 50–51, 106 S.Ct. at 2766–67. If these conditions are not present, then the challenged electoral practice cannot be considered as the cause of the minority's inability to elect its preferred candidates. *Id.* at 50, 106 S.Ct. at 2766.

## II. *The District Court's Findings*

The district court addressed the three "preconditions" of *Gingles* in its findings. The court found that Hispanics in Saguache County were sufficiently large and geographically compact to constitute a majority in a single district. The court went on to state, however, that Hispanics were not politically cohesive and that the plaintiffs had failed to demonstrate that whites voted sufficiently as a bloc to usually defeat the minority's preferred candidates.

The court found that Hispanics controlled the Democratic party in Saguache County and that Hispanics had a very strong say as to which candidates could run on the Democratic ticket. Based on this fact and on the testimony of the witnesses, the court found that several Anglo county commissioners had in fact been the preferred candidates of Hispanics. The court also observed that in two recent elections in which Hispanics had run for the county commission, the Hispanic candidate had lost by only 53 votes in one race and by 22 votes in the other. These close races, as

well as the election of Anglo candidates preferred by Hispanics, indicated to the court that Hispanics have the ability to elect commissioners under the at-large system currently in use in the county. Considering all of the circumstances, the court concluded that plaintiffs had failed to meet their burden of proving that Hispanics in Saguache County have less opportunity to participate in the political process and to elect representatives of their choice.

### III. *The Standards Applied by the District Court*

■ Appellants first contend that the district court applied an erroneous standard of law in its conclusion that Hispanics were not politically cohesive. Appellants argue that the test for political cohesion under § 2 is whether the minority group generally votes as a bloc for the same candidates. Appellant believes that, contrary to the standards set forth in *Gingles*, the district court seized upon party affiliation to "explain away" the plaintiffs' evidence that Hispanics tend to vote for the same candidates.

It is clear from *Gingles* that a showing that a significant number of minority group members usually vote for the same candidates can establish the requisite political cohesiveness under § 2. *Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769. Furthermore, we agree with appellants that a court may not explain away evidence of racial bloc voting by finding that such voting is caused by underlying differences between the minority and white population. The reasons why minority voters may vote alike is unimportant in determining whether in fact the minority group votes as a bloc. Racially polarized voting, which indicates political cohesion, exists when there is a consistent relationship between the race of the voter and the way in which the voter votes or, in other words, where minority voters and white voters vote differently. *Id.* at 53, n. 21, 106 S.Ct. at 2768, n. 21.

In our view, however, the district court did not employ an erroneous standard in concluding that Saguache County Hispanics were not politically cohesive. As an initial matter, appellants overstate the district court's reliance on party affiliation as a factor in its decision. The court briefly addressed the study of defendants' expert, Dr. Ellis, who sought to establish that party affiliation was the primary determinant of voter behavior in Saguache County. The court was critical of the methodology used by Dr. Ellis in his study, but tempered its criticism with the comment: "That doesn't mean that I give no weight to the analysis of Dr. Ellis, because I think what he has shown—and probably it's almost clear enough to be seen without any statistics—is that political party plays a very strong role in the results." (Tr.Vol. VII, p. 3). Appellants contend that this innocuous and undoubtedly correct observation requires reversal. We disagree. There is no indication that the court found plaintiffs' statistical evidence of Hispanic political cohesion to be insignificant because it could be explained by party affiliation. Rather, the court found that Hispanics were not politically cohesive based on the testimony of Mr. Gomez, who stated that his involvement in Saguache County politics had led him to the conclusion that Hispanics in the county consisted of several politically distinct groups which often support different candidates. We find no support for appellants' contention that the court relied on party affiliation to explain away or rebut evidence of racially polarized voting.

■ Along this same line, appellants contend that the issue of political cohesiveness must be determined by examining only "objective" factors, such as a correlation and regression analysis of voting data, and not through the testimony of lay witnesses. Clearly, a statistical analysis of voting data is highly relevant to the issue of political cohesion. *See e.g., Solomon v. Liberty County, Florida*, 865 F.2d 1566, 1574–78 (11th Cir.1988). We find nothing in *Gingles*, however, to suggest that a trial court is *prohibited* from considering lay testimony in deciding whether a minority group is politically cohesive. *See Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769 ("A showing that a significant number of minority group members usually vote for the same candidates is *one way* of proving . . . political cohe-

siveness....") (emphasis added). *See also Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1558 (11th Cir.1987) (Plaintiffs established racially polarized voting through regression analysis and the testimony of lay witnesses.) The experiences and observations of individuals involved in the political process are clearly relevant to the question of whether the minority group is politically cohesive. This testimony would seem to be required if the court is to identify the presence or absence of distinctive minority group interests. Thus, we cannot conclude that the district court's consideration of lay testimony violated the standards of *Gingles.*

■ Appellants next argue that the district court considered improper factors in its finding that Anglos do not usually vote as a bloc to defeat minority preferred candidates. Appellants believe that the court erred because it considered the election of unopposed Hispanics to county office as evidence of Anglo support for Hispanics. It must be noted that *Gingles* cautions against attaching too much significance to the success of unopposed minority candidates: "[T]he success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent ... may explain minority electoral success in a polarized contest." *Id.* at 57, 106 S.Ct. at 2770. In the instant case, the trial court summarized the significance of the election of unopposed Hispanics as follows:

> There is also, I guess, an assumption in these considerations in the statistics that we should not—the court should not consider the races where an Hispanic is unopposed. But it would seem to me there is an equally important inference that if an Hispanic is unopposed, he is, indeed, supported by Anglos or he wouldn't be unopposed. It seems to me that inference is one which can be made.

(Tr.Vol. VII, p. 4)

The district court did not err in its consideration of unopposed candidates. *Gingles* clearly does not establish a *per se* rule

against consideration of such evidence; it does caution against foreclosing claims on that basis alone. In this case, we cannot conclude that the district court gave undue weight to those races in which a Hispanic ran unopposed. The election of unopposed Hispanics was only one of several factors leading to the court's findings on vote dilution.

■ Appellants also contend that it was improper for the court to consider the election of three Anglo Democrats to the county commission as evidence of Hispanics' ability to elect candidates of their preference. Citing two Fifth Circuit decisions, appellants suggest that it is inappropriate to consider candidates who are not themselves minorities in determining whether racial bloc voting exists and in determining whether the minority group has been able to elect candidates of their preference. This question is important in the present case because it is clear that the success of certain Anglo candidates played a significant part in the court's finding that vote dilution had not occurred.

The *Gingles* opinion offers little guidance on what significance the race of the candidates is to be given in assessing a § 2 claim. In *Gingles,* the district court found that black voters had been denied equal opportunity to elect candidates of their preference. In reaching this finding, the district court considered only elections that pitted black candidates against white candidates. The Supreme Court affirmed but was divided on the importance of the race of the minority group's candidate. Four justices were of the view that "the race of the candidate *per se* is irrelevant to racial bloc voting analysis." *Id.* at 67, 106 S.Ct. at 2775. Under this view, only the *status* of the candidate as the chosen representative of a racial group is important. *Id.* A total of five justices, however, felt that such a hard and fast rule was contrary to precedent and was not necessary to the disposition of the case. *Id.* at 83, 101, 106 S.Ct. at 2784, 2793. This division on the Supreme Court prompted a difference of opinion among the circuit courts as well. At least one circuit has adopted Justice

Brennan's view that the race of the candidate is irrelevant to voting analysis. *See Carrollton Branch of NAACP v. Stallings,* 829 F.2d 1547, 1557–58 (11th Cir. 1987). In contrast, two Fifth Circuit cases have interpreted *Gingles* to mean that "the race of the candidate is in general of less significance than the race of the voter—but only within the context of an election that offers voters the choice of supporting a viable minority candidate." *Campos v. City of Baytown, Texas,* 840 F.2d 1240, 1245 (5th Cir.1988), petition for cert. filed, (citing *Citizens For A Better Gretna v. City of Gretna, La.,* 834 F.2d 496 (5th Cir.1987), *rehearing denied* 849 F.2d 1471, petition for cert. filed. These cases suggest that the court should exclude from its analysis elections that do not include a candidate who is a minority. *Gretna,* 834 F.2d at 504 ("[I]mplicit in the *Gingles* holding is the notion that black preference is determined from elections which offer the choice of a black candidate.") *But see Overton v. City of Austin,* 871 F.2d 529 (5th Cir.1989) ("In the absence of further Supreme Court guidance, we do not criticize this methodology, although it is not the only permissible way to approach § 2 claims.")

We do not believe that a *per se* rule against examining races that have only white candidates is implicit in *Gingles.* Such a rule would be clearly contrary to the plurality opinion, which views the race of the candidates as irrelevant in voting analysis. Moreover, such a rule is questionable in light of the language of § 2, which seeks to give minorities equal opportunity to "elect representatives *of their choice.*" 42 U.S.C. § 1973(b). Nothing in the statute indicates that the chosen representative of a minority group must be a minority. Additionally, § 2 requires that the district court make a determination from the totality of the circumstances, not from a selected set of circumstances. Accordingly, we conclude that there is no rule of law prohibiting the district court from examining those elections having only Anglo candidates. Such elections may be relevant and can be used to discern whether racially polarized voting exists and to mea-

sure the success of minority preferred candidates, so long as one of the Anglo candidates can be considered a preferred candidate of the minority group. As with other types of relevant evidence, the district court has a right to consider these elections and to give them such weight as the circumstances warrant. Based on the facts of this case, we cannot conclude that the district court erred in considering races having only Anglo candidates.

## IV. *Factual Findings*

Appellants next challenge the factual findings of the district court. In particular, appellants contest the findings that Hispanics were not politically cohesive, that Anglo Democrats had been chosen by the minority group, and the overall finding that Hispanic votes had not been diluted in violation of § 2.

■ We begin by noting that the clearly erroneous test of Rule 52(a) is the appropriate standard for appellate review of factual findings, including the trial court's ultimate findings on vote dilution. *Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781. The application of this standard "preserves the benefit of the trial court's particular familiarity with the indigenous political reality...." *Id.* Furthermore, if the district court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact it would have weighed the evidence differently. *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Id.*

■ Applying the foregoing standard to the record in this case, we cannot say that the district court erred in finding that Hispanics were not politically cohesive. As an initial matter, the district court found the testimony of Mr. Gomez to be straightforward and believable. Mr. Gomez, who was familiar with the political situation in Sa-

guache County, testified as to some of the differences among Hispanics in the county including the differing political objectives of various factions. *See Anderson, supra,* at 575, 105 S.Ct. at 1512 ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings.") He cited instances where Hispanics differed on which candidates to support. For example, he stated that Mr. Abeyta could have won his race for the county commission in 1982, except that members of Abeyta's own family worked against him.

Appellants assume that their statistical evidence conclusively showed political cohesion among Hispanics. Yet, the district court specifically found the plaintiffs' study to be inadequate because it did not consider Anglo candidates who were sponsored by Hispanics. Thus the trial court considered plaintiffs' statistics to be somewhat unreliable. Moreover, we note that of the ten races analyzed by plaintiffs' expert, four involved state representative elections covering a five-county area. The district court may have considered these elections to be of limited value in assessing whether voting for county commission seats was racially polarized. Of the six remaining races analyzed, only three were general elections for the Saguache County Commission. With this limited number of elections underlying the plaintiffs' claim, together with the evidence suggesting that Hispanics were not politically cohesive, the trial court's finding that plaintiffs failed to meet their burden of proof is not clearly erroneous.

Similarly, the district court was not clearly erroneous in finding that three Anglo Democratic candidates were the chosen representatives of Hispanics. The district court found that Hispanics controlled the Democratic party in Saguache County, a finding that is not seriously challenged on appeal. That finding was supported by the evidence, which showed that Hispanics constituted a majority of the Democratic party and were very active in the political process. There was testimony to the effect that no candidate could secure the Democratic slot in county races without the support of a group of Hispanics that included some of the plaintiffs. There was testimony that Hispanics had chosen and supported Anglo candidates for the county commission. In light of these facts, we cannot conclude that the district court clearly erred in finding that Hispanics had been able to elect several county commissioners, even if the successful candidates were Anglos. Plaintiffs failed to explain how these candidates could obtain the nomination and support of the Democratic party if, as plaintiffs now contend, they were not the choice of Hispanics. Not only did these candidates receive substantial Hispanic support in terms of votes, but the evidence suggests that they were *chosen* by Hispanics in the first place. *Cf. White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) ("[T]he black community has been effectively excluded from participation in the Democratic primary selection process.") *See also Whitcomb v. Chavis,* 403 U.S. 124, 129, 91 S.Ct. 1858, 1861, 29 L.Ed.2d 363 (1971) ("We have discovered nothing in the record or the court's findings indicating that poor Negroes were not allowed to register or vote, to choose the political party they desired to support, to participate in its affairs or to be equally represented on those occasions when legislative candidates were chosen.")

The foregoing factors support the trial court's finding that the electoral system used to elect Saguache County Commissioners does not violate § 2. The high level of Hispanic participation in the political process and the success of several Hispanic-supported candidates weighs heavily against a finding of vote dilution. Also, the plaintiffs' evidence in the district court was found to be lacking in several respects, including the failure of plaintiffs' expert to analyze all of the relevant elections. Although the lack of success of Hispanic candidates is a strong factor tending to show vote dilution, we cannot conclude that the district court clearly erred in finding otherwise. The court carefully considered the totality of the circumstances in this case and concluded that Hispanics have an equal

opportunity to participate in the political process and to elect representatives of their choice. This determination is "peculiarly dependent upon the facts of each case." *Gingles,* 478 U.S. at 79, 106 S.Ct. at 2781. As the Supreme Court stated in *White v. Regester,* 412 U.S. at 769–70, 93 S.Ct. at 2341–42: "[W]e are not inclined to overturn these findings, representing as they do a blend of history and an intensely local appraisal of the design and impact of the ... [electoral mechanism] in light of past and present reality, political and otherwise."

## V. *Sufficiency of the Trial Court's Findings*

■ Appellants' final contention is that the trial court's findings, which were made from the bench, were not detailed enough to meet the requirements of Rule 52(a). Appellant cites several decisions emphasizing the need for detailed findings in vote dilution cases. *See e.g., Velasquez v. City of Abilene,* 725 F.2d 1017, 1020 (5th Cir. 1984). Although the trial court's findings in this case could have been more detailed, the court made findings on all of the *Gingles* factors and disclosed the factual bases for its findings. This is sufficient to meet the requirements of Rule 52. *See Colorado Flying Academy, Inc. v. United States,* 724 F.2d 871 (10th Cir.1984), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986). *See also McGruder v. Phillips County Election Commission,* 850 F.2d 406, 411 (8th Cir.1988). Similarly, although written findings are preferable in this type of case, they are not required by Rule 52(a).

The judgment of the district court is AFFIRMED.