Shirley M. HARVELL; Emmanuel Lofton, Reverend; Hattie Middlebrook; Mary Alice Jones; Jacquelin Henton, Appellants,

v.

BLYTHEVILLE SCHOOL DISTRICT # 5, A Public Body Corporate; William Tomlinson, Individually and as Board Member; Norvell Moore, Individually and as Board Member; William Sullivan, Individually and as Board Member; Harold Sudbury, Jr., Individually and as Board Member; Helen Nunn, Individually and as Board Member; Karen Fraser, Individually and as Board Member; Steve Littrell, Individually and as Board Member; William Stovall, III, also known as Bill Stovell, Individually and as Board Member; Blytheville School District # 5, Board of Directors; Dr. Frank Ladd, Individually and in his official capacity as Superintendent of Blytheville School District No. 5, Appellees.

No. 93–1009.

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1993.

Decided Aug. 24, 1994.

Rehearing Granted, Opinion and Judgment Vacated Nov. 16, 1994.

Mark Terry Burnette, Little Rock, AR, argued (John Walker, on the brief), for appellants.

Robert V. Light, Little Rock, AR, argued, for appellees.

Before WOLLMAN and LOKEN, Circuit Judges, and HUNTER,* Senior District Judge.

WOLLMAN, Circuit Judge.

Shirley Harvell and other voters in the Blytheville School District appeal from the district court's order and supplemental findings of fact dismissing their Voting Rights Act complaint following our remand in *Harvell v. Ladd,* 958 F.2d 226 (8th Cir.1992). The defendants cross-appeal from the district court's denial of their motion for attorneys'

fees and Rule 11 sanctions. We affirm in part and reverse in part.

## I.

The Blytheville School District (the "district") encompasses the city of Blytheville, Arkansas, and adjacent rural areas outside the city limits. According to the 1980 federal census, the district has a population of 23,500, of whom approximately 64% are white and 35% are black. The voting age population, the pertinent population for Voting Rights Act purposes, is 14,500, of whom approximately 70% are white and 29% are black. The district court found that the black population in the district is geographically compact, located on the south side of the city of Blytheville, and is a politically cohesive group.

The Blytheville School Board ("the board") consists of eight members. Each member serves a four-year term, and two terms expire each year. Under the election scheme that was in place until 1987, the candidate who received the most votes was elected to the board, whether or not that candidate received a majority vote. "When several candidates would run for one slot, only one of them black, the white vote would be split among the white candidates, while the black vote would concentrate on the black candidate, and the black candidate would be elected." *Harvell,* 958 F.2d at 228.[1] In 1987, this voting scheme was changed by statute to require board members to be elected by majority vote. Ark.Code Ann. § 6–14–121. Thus, unless one candidate receives a clear majority of the votes on the first round, there will be a run-off election between the two candidates who have received the most votes in the first round. No run-off elections have occurred since 1987 because all successful candidates have been elected by a majority of votes cast in the first round.

Prior to the 1970s, Blytheville voters had picked few black candidates to represent them on the Blytheville School Board. Beginning in 1974, however, with the election of

---

* The HONORABLE ELMO B. HUNTER, Senior United States District Judge for the Western District of Missouri, sitting by designation.

1. This process is referred to colloquially as "bullet voting" or "single-shot voting."

Ayre E. "Pop" Lester, there has always been at least one black board member.[2] From 1975 through 1991, two of the eight board members were black. All but two of the black members were elected to the board through unopposed races or bullet voting. Dr. Helen Nunn defeated a white candidate in 1982, then was re-elected in unopposed races in 1986 and 1990. Norvell Moore was elected through bullet voting in 1975. He was re-elected in unopposed races in 1979 and 1983. After winning re-election in 1987, Moore chose not to run for re-election in 1991.

Harvell, an unsuccessful black candidate for the board, and four black citizens[3] of the district brought suit under Section 2 of the Voting Rights Act in the fall of 1989, after two elections under the new scheme. Harvell challenged the at-large election of board members under the 1987 majority vote scheme. Harvell proposed an eight district scheme, under which one member of the board would be elected from each district. The district court found that the sustained electoral success of black candidates in filling two out of eight board positions precluded a finding of a Section 2 violation. *Harvell v. Ladd,* 759 F.Supp. 525, 529 (E.D.Ark.1991). Accordingly, the district court held that Harvell had not set forth a prima facie case for a violation of Section 2 of the Voting Rights Act, dismissed Harvell's complaint, and entered judgment in favor of the defendants. *Id.* at 529-30.

Harvell appealed, contending that the district court had erred in finding that a sustained minority presence on the board precluded a finding of a violation of the Act. *Harvell,* 958 F.2d at 228. Harvell further contended that the district court had failed to make findings sufficient to satisfy the requirements of *Buckanaga v. Sisseton Independent School District, No. 54-5,* 804 F.2d 469, 472 (8th Cir.1986). *Id.* The defendants cross-appealed, contending that the district

court had erred in denying their motion for sanctions and attorneys' fees and in refusing to dismiss the case on the basis of laches and equitable principles. *Id.*

We affirmed the denial of sanctions, but reversed the judgment dismissing the complaint and remanded to the district court for entry of further factual findings concerning the nine factors contained in the Senate Report accompanying the Voting Rights Act and set forth in *Thornburg v. Gingles,* 478 U.S. 30, 36-37, 106 S.Ct. 2752, 2758-59, 92 L.Ed.2d 25 (1986). *Ladd,* 958 F.2d at 230. Because of the change from a plurality to a majority vote scheme in the 1988 election and thereafter, we cautioned that "successes prior to the 1988 majority vote requirement do not necessarily reflect the black voters' present ability to elect representatives of their choice under the current election scheme." *Id.*

On remand, the district court entered findings with respect to each of the nine Senate Report factors. *See* Dist.Ct.Order, No. J-C-89-225 (E.D.Ark. Dec. 18, 1992). The court again dismissed Harvell's complaint, this time based upon its finding that Harvell had failed to satisfy the third *Gingles* precondition because she did not "prove that the white majority votes such as to enable it 'usually to defeat the minority's *preferred* candidate.'" *Id.* at 9 (quoting *Ladd,* 958 F.2d at 229) (emphasis added by district court). The court held that Harvell had failed to meet her burden because the post-1987 low minority voter turnout could indicate that the black candidates were not the minority's preferred candidates.

Harvell now appeals from the district court's finding that she failed to satisfy her burden in proving the third *Gingles* precondition. Harvell also contends that the court's findings with respect to a number of the Senate Report factors are clearly erroneous. Defendants cross-appeal, reiterating their re-

2. The successful black candidates and their respective terms of service on the board are as follows: Ayre E. "Pop" Lester (1974–82); Norvell Moore (1975–91); Dr. Helen Nunn (1982– ).

3. The five named plaintiffs are Shirley M. Harvell, Rev. Emmanuel Lofton, Hattie Middlebrook, Mary Alice Jones, and Jacquelin Henton. Har-

vell was an unsuccessful candidate for the board in 1989, 1990, and 1991. Middlebrook was defeated in her attempt to run for the board in 1991, after this suit was initiated. For the sake of convenience, we refer to the plaintiffs in this opinion collectively as "Harvell."

quest for sanctions under Federal Rule of Civil Procedure 11 and for attorneys' fees under 42 U.S.C. § 1988.

## II.

In 1982, Congress amended Section 2 of the Voting Rights Act to repudiate the "intent test" of *City of Mobile, Alabama v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). *Gomez v. City of Watsonville*, 863 F.2d 1407, 1411 (9th Cir.1988), *cert. denied*, 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989). Absent a showing that an electoral scheme was intentionally designed or maintained for a discriminatory purpose, the *Mobile* plurality did not permit a Section 2 challenge to the scheme. *Mobile*, 446 U.S. at 62–65, 100 S.Ct. at 1497–99. The 1982 amendments replaced the intent test with a "results test." *Gomez*, 863 F.2d at 1411. Section 2, as amended, prohibits any state or political subdivision from using any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color." 42 U.S.C. § 1973(a). *But see Holder v. Hall*, — U.S. —, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (holding that the size of a governing body is not subject to a Section 2 vote dilution challenge).

To establish a violation of Section 2, the plaintiff must show, based on the totality of the circumstances, that "members [of a protected class] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 1973(b). In *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court delineated three preconditions that the plaintiff must establish to show that a multimember district violates Section 2.

First, the plaintiff must show that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district. *Id.* at 50, 106 S.Ct. at 2766. Second, the plaintiff must show that the minority group is politically cohesive. *Id.* at 51, 106 S.Ct. at 2766–67. Third, the plaintiff must show that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate. *Id.; see also Growe v. Emison*, — U.S. —, —, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993).

In *Gingles*, the Supreme Court also set forth nine factors that the Senate mentioned in its report accompanying the Voting Rights Act to guide a court in determining whether the challenged electoral scheme dilutes the minority's voting strength. *Gingles*, 478 U.S. at 36. These include (1) the history of voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the state or subdivision is racially polarized; (3) the extent to which the state or subdivision has used voting practices or procedures that tend to enhance opportunities for discrimination against the minority group; (4) whether minority candidates have been denied access to any candidate slating process; (5) the extent to which minorities have borne the effects of past discrimination in relation to education, employment, and health; (6) whether local political campaigns have used overt or subtle racial appeals; (7) the extent to which minority group members have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the minority group; and (9) whether the policy underlying the use of voting qualifications is tenuous. *Id.* 478 U.S. at 36–37, 106 S.Ct. at 2758–60.

## III.

We apply the clearly erroneous standard of review to a district court's ultimate finding of fact that a Voting Rights Act violation has not occurred. *Gingles*, 478 U.S. at 78–79, 106 S.Ct. at 2780–81; *Ladd*, 958 F.2d at 229. We will, however, "correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781 (quoting *Bose Corp. v. Consumers Union, Inc.*, 466 U.S. 485, 501, 104 S.Ct. 1949, 1959–60, 80 L.Ed.2d 502 (1984)). When a district court's findings are set aside because they

rest on an erroneous view of the law, the case is usually remanded so that the district court can determine the issue using the correct legal standard. *Gomez,* 863 F.2d at 1411 (citing *Pullman–Standard v. Swint,* 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982)). Remand is not necessary, however, when the record "permits only one resolution of the factual issue." *Id.* (quoting *Pullman–Standard,* 456 U.S. at 287, 102 S.Ct. at 1789).

We turn, then, to Harvell's claim that the district court erred in finding that she had failed to prove the third *Gingles* precondition, namely, that "the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766–67.

■ Courts generally examine actual election returns in analyzing the *Gingles* preconditions. *See Gingles,* 478 U.S. at 63, 106 S.Ct. at 2772–73; *Collins v. City of Norfolk,* 816 F.2d 932, 935 (4th Cir.1987); *Smith v. Clinton,* 687 F.Supp. 1310, 1317 (E.D.Ark. 1988) (three-judge court). A court analyzing the second *Gingles* precondition, minority political cohesiveness, should look only to actual voting patterns rather than speculating as to the reasons why many minorities are apathetic. *Gomez v. City of Watsonville,* 863 F.2d 1407, 1416 (9th Cir.1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989). Likewise, a court analyzing the third *Gingles* precondition should identify the preferred minority candidate by referring to how the minority voters actually cast their ballots rather than speculating why some minority voters choose not to cast ballots. *See, e.g., Collins,* 816 F.2d at 937–38 (candidate who receives most minority votes is preferred minority candidate); *Jeffers v. Clinton,* 730 F.Supp. 196, 208–09 (E.D.Ark. 1989) (three-judge court) (examining previous election returns and considering only the preferences of the minority voters who voted), *aff'd,* 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991).

■ The record in this case contains no persuasive evidence explaining the post–1987 decrease in minority voter turnout. Moreover, low minority voter registration and turnout often evidence electoral schemes in which minorities do not have an equal opportunity to participate in the electoral process and elect representatives of their choice. *Gomez,* 863 F.2d at 1416 n. 4 (citing *Gingles,* 478 U.S. at 38–39, 106 S.Ct. at 2759–60). The district court should have identified the preferred minority candidates by considering only how the minority voters actually voted rather than engaging in speculation concerning the causes of minority voter apathy. We conclude, therefore, that the district court erred in finding that because a threshold level of eligible minority voters did not go to the polls, the post–1987 black candidates were not preferred minority candidates. We express no opinion, however, concerning the relevance of minority voter apathy when there is compelling evidence directly linking such apathy to a candidate's unpopularity among the minority voters.

Because the district court's findings rest on an erroneous view of the law, they must be set aside. We need not remand this case, however, because the record establishes that the post–1987 minority candidates were the minority voters' preferred choice.

We cannot assume that every minority candidate is the minority voters' preferred choice. As the Third Circuit has held, the plaintiff must "establish on an election-by-election basis, by a preponderance of the evidence, which black candidates are minority-preferred." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* 4 F.3d 1103, 1126 (3d Cir.1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 2779, 129 L.Ed.2d 891 (1994). We find persuasive the Third Circuit's discussion of how a plaintiff meets the burden of showing that a minority candidate is the voters' preferred choice:

> [E]xperience does demonstrate that minority candidates will tend to be candidates of choice among the minority community. This practical experience leads to the inference that any particular minority candidate is minority preferred, and thereby takes plaintiffs a considerable distance towards meeting their production burden on this issue. This inference, however, is not enough on its own to meet this burden. Rather, plaintiffs must introduce some ad-

ditional evidence showing that the particular minority candidate is minority-preferred. The additional evidence required to meet the threshold, however, is not very substantial, and the burden may be satisfied with a variety of evidence, including lay testimony or statistical analyses of voting patterns.

*Id.; see also Jeffers,* 730 F.Supp. at 208 ("The fact is that there is a strong tendency for white voters to vote for white candidates when there is a black candidate in the race. Black voters behave in exactly the same fashion.... [I]t is a fact in present-day Arkansas politics, and there is no reason to suppose that it will change substantially in the near future.").

■ In this case, the evidence establishes that the post–1987 black candidates were preferred minority candidates. Through regression analysis, Harvell's expert determined that a very strong relationship existed between the black voting age population in a precinct and the support black candidates received in that precinct.[4] The relationship between black voting age population and black candidate support was as strong in this case as in *Jenkins.* In *Jenkins,* the plaintiffs' expert performed a regression analysis to determine the degree of relationship between the racial composition in each political unit and the support a candidate received within that political unit. *Id.* at 1119 n. 10. The statistical analysis yielded a correlation coefficient of 0.91, "which represents a highly consistent association between the number of votes received by a candidate of a particular race and the racial composition of the polling place." *Id.* at 1120. Because the regression analysis suggested that virtually 100% of the black voters voted for the black candidate, the Third Circuit concluded that the black candidate was the minority candidate of choice. *Id.* at 1127–28. Harvell's expert testified that his regression analysis indicated that black voters overwhelmingly vote for black candidates, and there is no evidence to rebut this showing. Accordingly, we conclude that the post–1987 black candidates were the minority's preferred candidates. *See also Citizens for a Better Gretna v. City*

*of Gretna,* 834 F.2d 496, 501 n. 11, 502 (5th Cir.1987) (holding that correlation coefficients of .963 and .926 revealed a "significant number" of blacks voting for a black candidate and qualified the candidate as the black-preferred candidate), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989).

Some lay testimony indicated that Harvell and Middlebrook may have had certain qualities that some minority voters may have found unappealing. There was no evidence, however, that these qualities caused Harvell and Middlebrook not to be the minority community's preferred candidates. Moreover, "[s]poradic lay testimony, while not irrelevant, is necessarily less indicative of black voters' voting patterns generally than the regression analysis." *Jenkins,* 4 F.3d at 1127.

As we discussed earlier, the district court emphasized the post–1987 low voter turnout. The statistical evidence, however, reveals that even in those elections in which the minority voter turnout was low, black voters overwhelmingly supported black candidates and white voters supported white candidates. We find the statistical analyses of the actual election returns more reliable than speculative explanations for the low voter turnout. Moreover, we have held that a court should limit its examination to actual election returns when the record does not adequately account for the cause of a particular voting pattern. Accordingly, because the record indicates that the post–1987 black candidates were the minority's preferred choice, we hold that Harvell has established the third *Gingles* precondition.

■ Recently, the Supreme Court reiterated that satisfying the three *Gingles* preconditions is not sufficient to establish a Section 2 violation. *Johnson v. De Grandy,* —— U.S. ——, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (finding that the district court erred by implicitly concluding that the failure to maximize the number of majority-minority districts violates Section 2). Thus, we turn to Senate Report factors to determine whether, based upon the totality of the circumstances, Harvell has shown that because of the at-large

---

4. Appendix II contains the results of the expert's statistical analysis.

election scheme, minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

The Supreme Court has recognized that when analyzing a Section 2 claim the two most important Senate factors are the extent to which voting is racially polarized and the extent to which minorities have been elected. *Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15. Both of these factors weigh in favor of a finding of a Section 2 violation. The district court found that voting in the school board elections is racially polarized. *See Harvell v. Lofton,* 759 F.Supp. 525, 527–28 (E.D.Ark.1991). The city does not dispute this finding. Since the enactment of the majority vote requirement, Dr. Nunn has been the only successful black candidate. The district court found that her victory fell within the "special circumstances" the Supreme Court recognized in *Gingles* because she ran unopposed as an incumbent. *Id.* at 530.

Harvell claims that the district court's findings on four other Senate factors are clearly erroneous. These other factors, if present, are "supportive of, but *not essential to,* a minority voter's claim." *Gingles,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15. We will examine each of her arguments in turn.

The district court found that "historic discrimination in the Blytheville School District area in regards to health, education, and employment does impair the ability of some blacks to participate effectively in the electoral process." Dist.Ct.Order, No. J–C–89–225, at 5 (E.D.Ark. Dec. 18, 1992). The district court discounted this finding, however, because "it cannot be contested that many of the impediments and economic disadvantages of over a quarter century ago have been alleviated and their effect on voting in Blytheville today is questionable." *Id.* With all due respect, we conclude that the district court erred by discounting its initial finding in view of the uncontroverted evidence that the percentage of black citizens in Blytheville who live below the poverty level, who are unemployed, and who have not completed high school is significantly greater than the percentage of white citizens. Moreover, the record links the low socioeconomic status of blacks to their inability to participate effectively in the political process.

Although the district court acknowledged that it should take judicial notice of the history of official racial discrimination in the electoral process in Arkansas, it gave this factor little weight because of state and national efforts to end racial discrimination. *Id.* at 3. We have consistently found that "[t]he state has a history of official discrimination in its electoral process." *Whitfield v. Democratic Party of State of Ark.,* 890 F.2d 1423, 1424 (8th Cir.1989), *cert. denied,* 498 U.S. 1126, 111 S.Ct. 1089, 112 L.Ed.2d 1193 (1991). As the Fifth Circuit has noted, because "Congress was concerned not only with present discrimination, but with the vestiges of discrimination which may interact with present political structures to perpetuate a historical lack of access to the political system[,] ... the court must provide a sounder basis for its conclusion than its personal opinion that discrimination has been eradicated in the recent past." *Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1211–12 (5th Cir.1989). Because the district court did not provide any reason other than its opinion concerning recently taken steps to eradicate discrimination, however laudable and salutary those steps may be, we agree with Harvell that the district court erred by giving insufficient weight to the history of racial discrimination in Arkansas.

When analyzing the extent to which the voting practices and procedures in Blytheville School District may enhance the opportunity for discrimination, the district court considered, as provided by the Senate Report, the majority vote requirement. The district court found that the Arkansas majority vote requirement might enhance the opportunity for discrimination against black voters. Dist.Ct.Order, No. J–C–89–225, at 4 (E.D.Ark. Dec. 18, 1993). The court noted, however, that there had been no run-off elections since the enactment of the majority vote requirement and that no black candidate would have been successful under the preexisting plurality system. *Id.* Although the implication of the district court's finding is

that black voters are no worse off under the majority vote system than they were under the pre-existing plurality system, we believe that the voting pattern established under the new system requires a contrary finding. Under the prior system, black candidates may have had a chance of electoral success; under the new system, given the voting patterns of post–1987 elections, they appear to have almost none. The district court found that the electorate is racially polarized because the "majority of black voters vote for black candidates and the majority of white voters vote for white candidates." *Harvell v. Lofton,* 759 F.Supp. at 527 (E.D.Ark.1991). If only twenty-nine percent of the voters (the black voting age population) vote for a black candidate, it is mathematically impossible for that candidate, absent the "special circumstances" the Supreme Court recognized in *Gingles,* to receive a majority of the votes.

Although there is some evidence to the contrary, the district court's finding that the board is responsive to the complaints and needs of the minority community is not clearly erroneous. As we have noted, however, this factor is not essential to Harvell's claim. Indeed, the Senate Report states that a lack of responsiveness by elected officials to the needs of the minority community would be a factor of only "limited relevance." 1982 U.S.C.C.A.N. 177, 206–07; *see also Westwego Citizens for Better Government v. City of Westwego,* 946 F.2d 1109, 1123 (5th Cir.1991) (finding a Section 2 violation when the plaintiff did not prove a lack of responsiveness); *Jeffers v. Clinton,* 730 F.Supp. 196, 213–14 (E.D.Ark.1989) (three-judge court) (same), *aff'd,* 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991).[5]

In summary, we hold that the district court erred by finding that Harvell did not satisfy the third *Gingles* precondition. The record establishes that the post–1987 black candidates were the preferred minority candidates. After considering the totality of the circumstances, we conclude that the at-large electoral scheme dilutes the minority's voting strength. Accordingly, we reverse the dis-

trict court's judgment dismissing Harvell's claim and remand for implementation of a plan that comports with the requirements of Section 2.

Our holding that plaintiffs are entitled to relief on their claim perforce forecloses defendant's application for sanctions pursuant to Federal Rule of Civil Procedure 11 and attorneys' fees pursuant to 42 U.S.C. § 1988. Accordingly, we affirm the district court's denial of sanctions and attorneys' fees.

The judgment is affirmed in part and reversed in part, and the case is remanded to the district court for the entry of an appropriate remedial decree.

LOKEN, Circuit Judge, dissenting.

I respectfully dissent. For three reasons, I conclude that the record in this case does not establish that plaintiffs are entitled to relief under § 2 of the Voting Rights Act, 42 U.S.C. § 1973, as construed in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

1. This appeal focuses primarily on the district court's finding that plaintiffs have not satisfied the third precondition to § 2 relief adopted in *Gingles* by proving that the white majority in the Blytheville School District "votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." 478 U.S. at 51, 106 S.Ct. at 2766–67. To qualify as "legally significant white bloc voting," the Court went on to explain in *Gingles,* the white bloc vote must "normally ... defeat the combined strength of minority support plus white 'crossover' votes." 478 U.S. at 56, 106 S.Ct. at 2769.

In this case, neither the district court nor this court has found that the white majority "bloc votes" to a legally significant extent as defined in *Gingles.* In addressing another issue, the district court found that "usually ... the majority of white voters vote for white candidates." But that is not a finding of legally significant bloc voting by the white majority, because it fails to consider the combined strength of minority votes and majori-

---

5. Because Harvell has not challenged the district court's findings with respect to the other Senate Report factors, we need not address them.

ty crossover votes. Without a finding of legally significant white bloc voting, this court's analysis of the third *Gingles* precondition is fundamentally deficient.

Rather than analyze the bloc voting issue (or, more appropriately, *remand* to let the district court do so), the court makes the remarkable assertion that, "[i]f only twenty-nine percent of the voters (the black voting age population) vote for a black candidate, it is mathematically impossible for that candidate, absent the 'special circumstances' the Supreme Court recognized in *Gingles,* to receive a majority of the votes." *Ante* at 917. In other words, the court transforms the district court's finding that most voters vote for candidates of their own race into a blanket assumption that white voters in the Blytheville School District only vote for whites, despite the Supreme Court's recent admonition

> that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics.

*Johnson v. De Grandy,* —— U.S. ——, ——, 114 S.Ct. 2647, 2661, 129 L.Ed.2d 775 (1994). The court's assumption defies the facts in this case.

In 1982, two black candidates each ran against a single white opponent. Dr. Helen Nunn won, receiving 33% of the votes in precincts having more than an 80% white voting age population. Incumbent Ayre "Pop" Lester received 19% of the votes in those precincts and lost. In 1987, Norvell Moore also ran head-to-head against a white opponent. Mr. Moore received 46% of the votes cast in those predominantly white precincts and won. On this record, the court's conclusion that white bloc voting is usually

able to defeat the minority's preferred candidate as a matter of law is unsustainable.

The Supreme Court recently cautioned that

> "minority political cohesion" and "majority bloc voting" showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population. Unless these points are established, there neither has been a wrong nor can be a remedy.

*Growe v. Emison,* —— U.S. ——, ——, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993) (citation and footnote omitted). I fear the court has missed this signal.

2. The third *Gingles* precondition also requires proof that white bloc voting usually will defeat "the minority's preferred candidate." In determining that the Blytheville School District's losing black candidates since 1987 were minority preferred candidates, the court ignores the low number of minority voters in those elections and looks only at whether those losing candidates received most of the votes in minority-dominated precincts. But numerous cases confirm that low minority support is highly relevant to the preferred candidate issue. *See Collins v. City of Norfolk,* 883 F.2d 1232, 1238 (4th Cir.1989) ("black candidates who received few votes were not the black community's preferred candidates"), *cert. denied,* 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990); *Campos v. City of Baytown,* 840 F.2d 1240, 1245 & n. 7 (5th Cir.1988) (elections in which a minority candidate "gains little support from any segment of the community" need not be examined), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); *Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496, 503 (5th Cir.1987) (only those elections offering voters "a viable minority candidate" are relevant under the third *Gingles* precondition), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1988). The reason is obvious—the Voting Rights Act is intended to alleviate minority vote dilution, not candidate unpopularity.

A review of the entire record persuades me that the district court did not commit clear error in finding that the losing black

candidates since 1987 were not preferred minority candidates:

(a) In the twelve elections involving black candidates between 1969 and 1987, the black candidates received an average of 977 votes. Since 1988, black candidates have received an average of 237 votes (excluding Dr. Nunn's unopposed candidacy). In the two post–1987 races pitting two white candidates against a single black candidate, the black was defeated by both opponents (and therefore would not have been elected under the prior plurality-vote system).

(b) The number of votes cast in the two precincts with a black voting age majority accounted for 26% of the total votes in the 1982 election (when Dr. Nunn won and Pop Lester lost), but only 14% of the votes in the 1989 election, 12% in 1990, and 13% in 1991. Reflecting that decline, plaintiff Shirley Harvell received 90 of the 117 votes cast in those two precincts in 1990, whereas Mr. Lester received 456 of 522 votes and Dr. Nunn received 494 of 546 votes cast in those precincts in 1982.

(c) Only one black candidate since 1987 has received a majority of the votes cast in the precinct that most closely mirrors the total District population (40% black). In 1982, the two black candidates received over 75% of the votes cast in a similar precinct.

In my view, this is overwhelming evidence that the losing black candidates since 1987 were unpopular throughout the District and cannot be considered "the minority's preferred candidates." Yet the court dismisses this evidence with the comment that low minority voter turnout is "often evidence [of] electoral schemes in which minorities do not have an equal opportunity to participate." *Ante* at 914. Note the circular reasoning— the court is assuming that the system is illegal for the purpose of determining whether plaintiffs satisfied a *precondition* to proof of illegality. Moreover, the court's operative assumption—that the 1987 law caused mas-

sive black voter apathy—is factually without foundation. Prior to 1987, black candidates had won four of the previous five contested elections against white candidates, and had received the majority of votes cast in two of the previous three elections. With that electoral history, why would a majority-vote requirement suddenly cause black voters to lose all hope of success?

For the foregoing reasons, I conclude that plaintiffs have failed to prove that legally significant white bloc voting in the Blytheville School District will usually defeat a black preferred candidate. Accordingly, they have not satisfied the third *Gingles* precondition and § 2 relief must be denied.

3. Even if plaintiffs could satisfy the third *Gingles* precondition, I conclude they have failed to prove a § 2 violation. In *Gingles,* six Justices agreed that "consistent and sustained success by candidates preferred by minority voters is presumptively inconsistent with the existence of a § 2 violation." 478 U.S. at 102. In this case, a black citizen has held a seat on the Blytheville School Board every year since 1974. From 1975 until 1991, two of the eight elected Blytheville School Board members were black. Until Norvell Moore, a four-term incumbent, elected not to run in 1991, the 29% black minority succeeded in electing 25% of the Blytheville board members for sixteen straight years. "[A] minority cannot prove a § 2 violation in the face of continued and proportional success at the polls." *Collins v. City of Norfolk,* 816 F.2d 932, 937 (4th Cir.1987).

The court dismisses this "consistent and sustained success" virtually without discussion. First, the court simply ignores Moore's close election victory against a white opponent in 1987. Astonishingly, the court does not even clarify whether the 1987 majority-vote law (Ark.Code Ann. § 6–14–121) applied to that election, confirming that its entire § 2 analysis is based upon its *assumed* impact of that 1987 law.[6]

---

6. This highlights an analytical gap in the court's opinion that is potentially troublesome for the district court on remand. Plaintiffs' complaint attacked the District's at-large voting system. After condemning the 1987 law, the court declares that plaintiffs "are entitled to relief on their

claim," *ante* at 917, without clarifying the nature of the intended relief. Congress warned that its 1982 amendments to § 2 should not be construed as "an all-out assault on at-large election systems in general." S.Rep. No. 417, 97th Cong., 2d Sess. 27 (1982), *reprinted in* 1982

Next, the court dismisses the one successful black candidate since 1987 because Dr. Helen Nunn ran unopposed for a third term in 1990. While *Gingles* notes that incumbency and lack of opposition *may* be "special circumstances" that do not disprove a racially polarized electorate, we may not draw that conclusion without factual analysis. Dr. Nunn's prior election victories and standing in the at-large community may have persuaded potential white candidates that she was unbeatable. In a district with only 29% black voters, that would be strong evidence that the electorate is *not* so racially polarized that minority citizens "have less opportunity . . . to elect representatives of their choice," the ultimate issue under § 2. *See Sanchez v. Bond*, 875 F.2d 1488, 1493 (10th Cir.1989), *cert. denied*, 498 U.S. 937, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990). The court has impermissibly replaced these fact issues with its own assumptions about Blytheville School District voters.

Finally, the court simply ignores the pre–1987 black election victories, presumably because they occurred before the 1987 majority-vote law. Compare that analytical sleight-of-hand with *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1132 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2779, 129 L.Ed.2d 891 (1994), in which the court dismissed two-thirds of the relevant black election victories because they were "recent and, potentially, transitory." In other words, if a minority's "consistent and sustained success" is too dated *or* too recent to fit the judiciary's preconceived notions of voter behavior, courts may ignore that success! From my perspective, this kind of result-oriented analysis serves only to consecrate judicial assumptions about the way people vote so as to maximize judicial interference with and control over our democratic processes.

I do not know whether the 1987 majority-vote law will ultimately work to deprive minority voters in the at-large Blytheville School District of their rights under § 2. It may be that minority-preferred candidates will emerge but persistently fail to achieve proportional electoral success, in which case § 2 relief will no doubt be warranted. I think it is more likely that roughly the same number of blacks would be elected under both systems, but more "militant" blacks would be elected from the racially balkanized single-member districts plaintiffs desire.[7]

Plaintiffs, who have been unable to attract substantial black voter support under the current system, understandably want a new playing field. But our function is not "to dictate to the provinces the 'correct' theories of democratic representation, the 'best' electoral systems for securing truly 'representative' government, the 'fairest' proportions of minority political influence, or . . . the 'proper' sizes for local governing bodies." *Holder v. Hall*, —— U.S. ——, ——, 114 S.Ct. 2581, 2602, 129 L.Ed.2d 687 (1994) (Thomas, J., concurring). Plaintiffs have failed to prove a violation of § 2 of the Voting Rights Act, and I would affirm.

## APPENDIX I

The following table is a compilation of election results for the Blytheville, Arkansas, School Board from 1969 to 1992. Black candidates are designated by "B" and white candidates are designated by "W."

| YEAR | CANDIDATES | B/W | VOTES |
|------|-----------|-----|-------|
| 1969 | Dr. James C. Guard | W | 1,014 |
|      | Mrs. Carrie B. White | B | 769 |

U.S.C.C.A.N. 177, 205. Thus, the relief should be expressly limited to remedying the perceived impact of the 1987 law.

7. Two of the recent unsuccessful black candidates testified that they are regarded as "militant" or "radical" by other members of the community. "[I]t is appropriate to consider testimony revealing how political observers and the candidates themselves viewed the . . . claim that [the candidates] were the minority's preferred candidates and representatives of choice." *Collins v. City of Norfolk*, 883 F.2d at 1238.

| YEAR | CANDIDATES | B/W | VOTES |
|------|-----------|-----|-------|
| 1970 | Mason F. Day, Jr. | W | 2,212 |
|      | O.W. Weaver | B | 1,074 |
| 1973 | W.J. Tomlinson | W | 1,068 |
|      | Rev. T.J. Green | B | 907 |
| 1974 | Edwin L. Holstead | W | 415 |
|      | Dan M. Burge | W | 885 |
|      | Ayre E. "Pop" Lester | B | 1,232 |
| 1975 | George "Preacher" Nichols | W | 182 |
|      | Richard "Dick" Reid | W | 582 |
|      | Bill D. Jackson | W | 331 |
|      | Mrs. Allen Bush | W | 812 |
|      | Norvell Moore | B | 1,068 |
| 1978 | Ayre E. "Pop" Lester | B | Unopposed |
| 1979 | Norvell Moore | B | Unopposed |
| 1982 | Jerry Nall | W | 1,107 |
|      | Ayre E. "Pop" Lester | B | 948 |
|      | Harold Edwards | W | 901 |
|      | Dr. Helen Nunn | B | 1,187 |
| 1983 | Norvell Moore | B | Unopposed |
| 1986 | Dr. Helen Nunn | B | Unopposed |
| 1987 | Edwin L. Holstead | W | 606 |
|      | Norvell Moore | B | 629 |
| 1988 | Bill Sullivan | W | 758 |
|      | Curtis "Preacher" Smith | B | 166 |
| 1989 | Harold Sudbury, Jr. | W | 1,302 |
|      | Thurman J. Green, II | B | 287 |
|      | Steve Littrell | W | 1,299 |
|      | Shirley M. Harvell | B | 305 |
|      | Steward R. Jerome | W | 1,226 |
|      | Lawrence B. Haley | B | 374 |
| 1990 | Steve Littrell | W | 810 |
|      | Shirley Harvell | B | 135 |
|      | Dr. Helen Nunn | B | Unopposed |
| 1991 | Karen Sue Fraser | W | 927 |
|      | Phyllis Bloodworth | W | 388 |
|      | Hattie G. Middlebrook | B | 232 |
|      | James T. McMahan | W | 861 |
|      | Doug Wilson | W | 484 |
|      | Shirley Harvell | B | 223 |
| 1992 | Bill Sullivan | W | Unopposed |
|      | Bill Stovell, III | W | 456 |
|      | Shirley Milliken | B | 173 |

## APPENDIX II

| YEAR | CANDIDATES | CORRELATION COEFFICIENT * |
|------|-----------|---------------------------|
| 1988 | Bill Sullivan | 0.8437 |
|      | Curtis "Preacher" Smith | |

| YEAR | CANDIDATES | CORRELATION COEFFICIENT * |
|---|---|---|
| 1989 | Harold Sudbury, Jr. Thurman J. Green, II | 0.9582 |
| | Steve Littrell Shirley M. Harvell | 0.9674 |
| | Steward R. Jerome Lawrence B. Haley | 0.9673 |
| 1990 | Steve Littrell Shirley M. Harvell | 0.9086 |
| 1991 | Karen Sue Fraser Hattie G. Middlebrook | 0.942 |
| | James T. McMahan Shirley M. Harvell | 0.928 |
| 1992 | Bill Stovell, III Shirley Milliken | 0.838 |

\* The Correlation Coefficient (the "r" statistic) measures the strength of a relationship between two variables. The "r" may range from 0.0 (indicating the two variables are independent) to +1.0 (indicating the two variables are perfectly correlated in a positive direction).